Light STEPHENSON, Jr.,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Calvin J. SNOGA, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Jimmy R. SNOGA, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 768–86L, 298–88L and 299–88L.

United States Court of Federal Claims.

March 31, 1994[1].

Order Denying Reconsideration
April 21, 1995.

1. Reissued for publication, with minor editorial changes, on March 7, 1995.

Roger Easterday, Austin, TX, for Light Stephenson.

Daria Zane, General Litigation Section Env. & Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for the U.S.

## ORDER

WEINSTEIN, Judge.

Before the court are the parties' cross-motions for summary judgment on the date of taking of plaintiffs' "deep mineral estate," at depths over 1,300–1,500 feet, under the approximately 849 acre Stitz ranch.

■ The parties previously stipulated that the entire mineral estate was taken on or about May 18, 1982, when the government fenced and allegedly closed off the area and closed the floodgates to the Choke Canyon reservoir and dam, thus placing the property at immediate risk of flooding, but the government has withdrawn its stipulation, as to the deep mineral estate.[2]

---

**2.** The court is not bound to accept the parties' stipulation as to the date of taking, either of the shallow mineral estate, or of the mineral estate as a whole. *Cf. Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 8, 9, n. 10 & 11, 104 S.Ct. 2187, 2193, 2193–94, n. 10 & 11, 81 L.Ed.2d 1 (1984) (noting that the Supreme Court did not question Court of Appeals' agreement with District Court's determination that the parties' stipulation regarding the date of taking was not con-

Defendant claims that no inverse condemnation or taking of the deep mineral estate occurred prior to February 24, 1989, when the government filed a formal condemnation action and declaration of taking, pursuant to 40 U.S.C. § 258a *et seq.* (1988), with respect to 836 of the 849 acres in this case. *United States v. 844 Acres*, No. 89–22 (S.D.Tex. February 24, 1989). Specifically, the government claims that it did not physically interfere with or substantially damage plaintiffs' deep mineral estate because development of that estate was economically viable, by means of directional drilling, until the formal taking of the entire mineral estate in February 1989.[3]

Plaintiffs argue that defendant did in fact take both the shallow and deep mineral rights when public access was limited and the dam floodgates were closed. Plaintiffs contend that development of the deep mineral estate by directional drilling was not viable after that date and that the costs and risks made directional drilling infeasible and uneconomical. Plaintiffs also argue that deep mineral rights may not be severed from the shallow rights.

The court cannot grant either party's cross-motion for summary judgment. First, there are genuine disputes regarding issues of fact that are material to any decision regarding the central legal issue in this case—the date of an alleged taking of plaintiffs' mineral interests by the United States government. *See Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir. 1983) (noting that fact-intensive nature of just compensation jurisprudence argues against precipitous grants of summary judg-

ment); *see also Hendler v. United States*, 952 F.2d 1364, 1373 (Fed.Cir.1991) (noting "essentially *ad hoc,* factual inquiries" in which court must engage in takings cases).

Second, the court concludes that, because there is a significant possibility (for the reasons discussed below) that no taking occurred until February 24, 1989, when the declaration of taking in *844 Acres* was filed in the district court, and because the district court has exclusive jurisdiction to determine compensation if the taking occurred on that date, *Georgia–Pacific Corp. v. United States*, 568 F.2d 1316, 1322, 215 Ct.Cl. 354 *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978), and also has jurisdiction to determine both whether a taking occurred on an earlier date, and the compensation due as of that date, *United States v. Dow*, 357 U.S. 17, 21, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958), *Georgia–Pacific*, 568 F.2d at 1322, the interests of judicial economy would be served by staying this case to permit the district court to decide the factual issues relevant to whether it has exclusive jurisdiction and, even if not, the dates of the takings and the compensation due on such dates.

### Background

The Choke Canyon reservoir and dam are part of the Nueces River Project, in South Texas, which was authorized by the Reclamation Development Act of 1974, Pub.L. No. 93–493, 88 Stat. 1492 (1974). The United States thereafter, in the 1970's, acquired the surface estate of the Stitz Ranch (but not the plaintiffs' underlying mineral estate), including surface flowage easements to 233 feet above mean sea level (m.s.l.).[4] The Stitz

---

trolling); *Stanford's Estate v. Commissioner*, 308 U.S. 39, 51, 60 S.Ct. 51, 59, 84 L.Ed. 20 (1939) (citing *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289, 37 S.Ct. 287, 289–90, 61 L.Ed. 722 (1916) ("[T]he court cannot be controlled by agreement of counsel on a subsidiary question of law.")); *Tlingit & Haida Indians v. United States*, 389 F.2d 778, 791, 182 Ct.Cl. 130 (1968) ("[The court] is not bound, unless it chooses to be, by stipulations as to what the law is, or involving or incorporating a legal conclusion[.] In this category I would put *e.g.*, a stipulation as to the date of a "taking" in eminent domain.") (citations omitted) (Nichols, J., dissenting).

3. The government has not addressed the issue of whether the deep (or shallow) mineral interests in the other 13.2 acres involved in this case were not taken until the declaration of taking was filed in *United States v. 427.87 Acres*, No. 89–128 (S.D.Tex.), on December 8, 1989. *See infra,* note 3. Therefore, if the conclusion, *infra,* that a stay is required pending district court determination of a taking date, is not equally applicable to the claims of the owners of the mineral interests subject to the declaration in *427.87 Acres,* the parties shall advise the court within fourteen days of receipt of this order.

4. The mineral estate of the 849 acres in this case is comprised of the working and royalty interests

Ranch was located in the area that was expected to be substantially submerged once the dam waters reached their projected m.s.l. of 220.5 feet. The maximum expected level was 233 feet m.s.l.[5] Of the 849 acres involved in this case, 44.5 acres lie above 220.5 feet m.s.l. and five exceed the level of 233 feet m.s.l.

Plaintiffs initially identified the following geographical formations containing oil and gas reserves beneath the surface of the Stitz estate:

The Lower Government Wells formation lies at shallow depths of 600–660 feet. It is an isolated reservoir with potential to produce natural gas. Plaintiffs' appraiser, Golden Engineering, Inc. (GEI), estimated the 1982 value of these reserves at $54,000. The Calliham sand and Pettus formations are found at shallow depths of 700–1,100 feet. They have produced oil for many years. The value of those reserves in 1982 was set by GEI at $1,995,000 (or $2,210,000, including the Bellows & Dusek reserves).

After the stipulation as to date of taking was entered in this case, four deeper formations, the Wilcox, at 4,500 feet; the Olmos, at 9,600 feet; the Sligo, at 12,400 feet; and the Edwards, at 12,000 feet, were determined by GEI to have the possibility or potential to produce gas. GEI concluded that the value of the mineral (gas) reserves in the Edwards

was $3,708,000 as of 1982. The value of the mineral (oil) rights from the Wilcox, Sligo, and Olmos formations as of 1982 was set by Skylark Oil Company (SOC) at $509,472.

Of the adjoining land, defendant owns the surface and mineral estates in the portions east and west of the Stitz Ranch, while various plaintiffs own the surface interests in the land to the south.

Plaintiffs' claim that the Edwards formation is proved but undeveloped[6] is based on the Calliham well to the north. Although the Edwards has never produced commercially in the past, plaintiffs allege that it would have produced gas in commercial quantities if modern mining techniques had been used. Defendant challenges this classification and value because no wells exist into the Edwards formation in the area, and because the Calliham well was never commercially productive.

Defendant alternatively argues that, even if such deeper reserves do exist, there has been no interference with plaintiffs' development of these reserves, because they could have utilized directional drilling[7] to obtain production from these reserves.

Prior to 1970, only three wells had ever been drilled on the Stitz ranch. They never produced much and were abandoned in 1970 when injection production methods were re-

---

in fifteen separate tracts, each with distinct ownership. The mineral estates in all but one five acre tract are undivided by depth. Oil and gas leaseholds in eight of the tracts, comprising approximately 794 acres, were leased in 1919 by John Stitz to V.H. Blocker for all depths and thus are all subject to the same original 1919 base lease. 13.12 acres of the property was the subject of a condemnation action in *United States v. 427.27 Acres*, No. 89–128 (S.D.Tex.). Eight acres at issue in *United States v. 844 Acres* are not involved in this case.

**5.** Flooding above 176 feet m.s.l., the lowest level on the Stitz Ranch, was expected in sixty percent of the years, based on the volume expected in a fifteen day inflow.

**6.** The value of oil and gas interests depends on the degree of certainty that minerals exist. Mineral interests are classified in one of the following categories:

*Proved developed* reserves are those as to which the commercial productivity and volume of

reserves is supported by actual production or formation tests.

*Proved undeveloped* reserves may be established without drilling if (1) they are located in an area that directly offsets wells that have indicated commercial production in the objective formation; (2) there is reasonable certainty that the location is within known proved productive limits of the objective formation; (3) the location conforms to existing well spacing regulations, if any; and (4) it is reasonably certain that the location will be developed. *Unproved* reserves are classified as either probable (more likely to be recovered than not), or possible (cannot be determined with certainty whether minerals are recoverable).

**7.** In directional drilling, a drillpad is placed outside an inaccessible or flooded area, and the drilling is done at an angle, or directionally, into the formation below the flooded area. Defendant's and plaintiffs' experts have agreed that the technology existed, through directional drilling, to develop and produce the deep mineral estate in 1982.

quired, because, according to plaintiffs, the operator, plaintiff Grubstake Investment Association, had insufficient funds for an injection well.

In 1981, in exchange for an interest in the shallow oil and gas rights, plaintiffs contracted with Harmony Drilling, which drilled approximately six shallow exploratory wells on the property, in order to determine the value of plaintiffs' mineral rights for purposes of an expected imminent government condemnation of the entire property. Defendant plugged the existing wells on the Stitz estate between January 1981 and March 3, 1982.[8]

On or about February 27, 1982, defendant completed constructing a fence (begun in 1980) around the project area. On May 18, 1982, the dam was substantially completed and at least one access gate to the property was locked to the public. However, defendant contends, and plaintiffs do not expressly deny, that access remained possible through breaks in the fence, and along old Highway 72, and that one gate was not locked.

Thereafter, entry for oil and gas exploration was governed by decision of the U.S. Department of Interior's Bureau of Reclamation in consultation with state and local authorities. After 1981, plaintiffs never requested permission to enter for such purposes, or a permit to drill, either on the Ranch or on adjoining property owned by the government or other parties. The Bureau's guidelines precluded drilling from any surface below 220 feet m.s.l.

While flooding of portions of the property was possible within a few weeks of the flood gates' closure, which occurred on July 12, 1982, and flooding to 220.5 feet m.s.l. was an eventual certainty, the flood waters did not reach the Stitz Ranch until October 19, 1984 (at its lowest height, of 176 feet m.s.l.), and the normal reservoir level of 220.5 feet m.s.l. was not reached until July 17, 1987 (following steady rises in level after 1984). Adjoining tracts were fully condemned by the govern-

ment in 1981 and 1982, and the Bureau of Reclamation internally requested condemnation of the Stitz Ranch area in 1983 and 1985. The federal declaration was filed in 1989. *See United States v. 844 Acres.* The government claims that the delay was due to difficulty establishing ownership of the property interests to be condemned.

Plaintiffs Light Stephenson et al. filed an inverse condemnation complaint in this court in 1986 (No. 768–86L). That case later was consolidated with the cases of plaintiffs *Snoga* et al., Nos. 298–88L and 299–88L, which were filed in 1988. The entire case was stayed after the government's declaration of taking was filed in *844 Acres,* so that the District Court for the Southern District of Texas could decide title and ownership issues. A decision regarding title in 1989 was issued by the district court in *844 Acres* in 1990. *United States v. 844 Acres,* No. 89–22 (S.D.Tex., Aug 9, 1990).

Upon lifting of the stay in this case on June 4, 1991, the parties stipulated that the date of taking was May 18, 1982 and requested trial on the question of damages only.

However, in the course of discovery, plaintiffs produced the appraisal report of their expert, GEI, which concluded that "proven undeveloped" mineral reserves existed in a deep formation (the Edwards) from which there had never been any prior production. The working (leasehold) and royalty interests[9] in the deep Edwards formation were assigned a fair market value of $3,708,000 (out of the total valuation for plaintiffs' interests of $5,980,000), or approximately sixty-two percent of the total value of plaintiffs' mineral interests. If one also included the deep mineral interests in the Olmos, Sligo, and Wilcox formations, valued by SOC at $509,472, the proportional value of the deep mineral interests becomes $4,217,472 of $6,489,472, or approximately sixty-five percent of the alleged value of plaintiffs' total mineral estate. Depending upon the cost of

8. Plaintiffs concede that if, as alleged by defendant, the 1919 basehold lease had lapsed for lack of production by 1981, the plaintiffs who received leasehold assignments after that date must be dismissed. *See* Plaintiffs' Second Statement of Genuine Issues at 4.

9. The mineral owner/lessor may assign the right to develop, produce, and sell the minerals (leasehold or working interest), and retain a share (a royalty interest) in any gross revenue from such sale.

directional drilling (if feasible), the experts have valued the minerals produced by directional drilling from the deeper formations at between zero (if directional drilling costs 45% more) and over $1,936,000 (if directional drilling costs 35% more).

Defendant, contending that its agreement to the stipulation was based on the understanding that the mineral estate consisted only of "remaining proven reserves of oil and gas from shallow depths where there has been historic production," moved to withdraw the stipulation as to the deep mineral reserves. The motion was allowed. Thereafter, defendant filed a motion for summary judgment that the date of taking of the deep mineral estate occurred in 1989, and plaintiff moved for summary judgment that the taking date for the entire mineral estate was May 19, 1982.

*Discussion*

*Taking.*

■ The United States must pay just compensation for private property that it takes for public use by eminent domain (inverse condemnation). *Kirby Forest Indus., Inc. v. United States,* 467 U.S. at 9–10, 104 S.Ct. at 2193–94.

Each case is determined on its facts. *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390–91, 62 L.Ed.2d 332 (1979); *see generally Georgia–Pacific Corp. v. United States,* 640 F.2d 328, 336, 226 Ct.Cl. 95 (1980).

■ Flooding may constitute a physical taking, if it permanently destroys or impairs all of the usefulness of the property. *Pumpelly v. Green Bay,* 80 U.S. (13 Wall.) 166, 181, 20 L.Ed. 557 (1871); *Sanguinetti v. United States,* 264 U.S. 146, 148–49, 44 S.Ct. 264, 265, 68 L.Ed. 608 (1924); *see also Loesch v. United States,* 645 F.2d 905, 914, 227 Ct.Cl. 34, *cert. denied,* 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981); *Barnes v. United States,* 538 F.2d 865, 870, 210 Ct.Cl. 467 (1976). Flooding caused by government construction of a dam does not become a

taking merely upon the threat of flooding, or when the public is given notice that the land will be submerged, or when the dam is commissioned or completed. *See Danforth v. United States,* 308 U.S. 271, 286, 60 S.Ct. 231, 237, 84 L.Ed. 240 (1939).

■ Even upon actual flooding, unless future intermittent, frequent, and recurring flooding is inevitable, no taking has been completed until the situation has "stabilized." *United States v. Dickinson,* 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947); *see also Cooper v. United States,* 827 F.2d 762, 764 (Fed.Cir.1987).

*Dickinson* does *not,* as plaintiffs imply, hold that a mere threat of inundation is a taking (Justice Frankfurter explicitly declines to address this issue) but, rather, that even actual inundation was *not* a final or completed taking for purposes of tolling the statute of limitations or determining property ownership. 331 U.S. at 749, 67 S.Ct. at 1385. Thus, the plaintiff in *Dickinson,* who had acquired the land after the flooding, nonetheless was not divested of his property and was permitted to bring an inverse condemnation suit. *Id.*[10]

The federal cases holding that flooding may constitute a taking have involved takings of the entire fee simple interest in the whole property, or surface estates only, *see, e.g., First English Evangelical Lutheran Church v. California,* 482 U.S. 304, 307, 107 S.Ct. 2378, 3281–82, 96 L.Ed.2d 250 (1987), not partial takings of different mineral estates. *Severance of Deep Estate.*

■ Defendant has not presented a persuasive rationale for judicially segregating the plaintiffs' property interests into deep and shallow mineral estates.

The Supreme Court has held that "a parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for taking of part or all of it." *United States v. Miller,* 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943). More recently, in *Concrete Pipe & Prods. v. Con-*

**10.** Plaintiff Light Stephenson, Jr. has conceded that the threat of flooding existed long before the government planned to build a dam, as evidenced by actual flooding in the 1960's and 1970's, which he stated closed down drilling activities at those times. *See* Defendant's Exhibit K at 16.

*struction Laborers Pension Trust,* —— U.S. ——, ——, 113 S.Ct. 2264, 2290, 124 L.Ed.2d. 539 (1993) (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987) and *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 130–31, 98 S.Ct. 2646, 2662–63, 57 L.Ed.2d 631 (1978)), the Supreme Court has reaffirmed that "a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable.... the relevant question, however, is whether the property taken is all, or only a portion, of the parcel in question." *See also, Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) ("destruction of one 'strand' of the bundle [of property rights] is not a taking, because the aggregate must be viewed in its entirety.")

It appears from these cases that the proper focus is the totality of an owner's rights in the property. Identifying the property taken is clearly a thorny legal question, however. *See Lucas v. South Carolina Coastal Council,* —— U.S. ——, —— n. 7, 112 S.Ct. 2886, 1294 n. 7, 120 L.Ed.2d 798 (1992); *Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560, 1567–68 & n. 20 (Fed.Cir.1994).

■ Ultimately, the question of the extent or nature of a property interest depends on state law. *See Preseault v. ICC,* 494 U.S. 1, 16 n. 9, 20–25, 110 S.Ct. 914, 924 n. 9, 926–28, 108 L.Ed.2d 1 (1990); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984) ("property interests are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understanding that stem from an independent source such as state law").

While a separate leasehold mineral estate theoretically may be delineated by depth (the leasehold estate, but not the mineral estate, in fact was so divided in certain prior assignments of property at issue in this case) under Texas state law (as a matter of contract, however, rather than property law), the ownership of this estate (except for one five acre tract divided at 5,000 feet) is not currently so divided. Rather, the shallow and deep mineral interests appear to be merged. *Cf. Henley v. United States,* 396 F.2d 956, 964, 184 Ct.Cl. 315 (1968).

The court is aware of no case where a Texas court (or any other court) has deemed deep and shallow oil and gas mineral rights to be divided and separately taken by eminent domain.

■ The Texas courts have held that only an effective deed will operate to sever the surface and mineral estates. *Rio Bravo Oil Co. v. Staley Oil Co.,* 138 Tex. 198, 158 S.W.2d 293, 295 (Comm'n App.1942). *See also Storm Assoc., Inc. v. Texaco, Inc.,* 645 S.W.2d 579, 587 (Tex.Ct.App.1982) (one of the bundle of interests owned by the owner of a mineral estate becomes a separate estate when it is conveyed or reserved) (citing *Extraction Resources, Inc. v. Freeman,* 555 S.W.2d 156 (Tex.Civ.App.1977)). There appears to be no Texas authority for the conclusion that the analogous severance of different levels of a mineral estate can be accomplished without a deed.[11]

The government also has not differentiated these interests in the declarations of taking filed in the district court, *i.e.,* it has not sought a declaration as to the deep rights only, nor amended the declaration to exclude shallow rights or to limit the property interest to that of the deep mineral rights owners. *Physical Taking.*

Plaintiff contends that this case involves both a physical and a regulatory taking. Defendant maintains that the facts support neither type.

■ A taking by physical occupation of the deep mineral rights—the test for which is whether the property has been permanently physically occupied, *see Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 421, 102 S.Ct. 3164, 3168, 73 L.Ed.2d 868 (1982)—does not appear to have occurred in this case in 1982, since the subsurface miner-

---

11. Texas law does not provide a legal definition of a "deep" or "shallow" mineral estate, *i.e.,* identify such an estate by depth. Rather, the cases illustrate that the delineation of depth, if any, is a matter of negotiation by the parties— assignor and assignee of an estate.

al estate was not directly physically invaded, taken, or impacted, by removal or otherwise, by the government's action, including by the surface flooding.

■ Mere possession by flooding does not constitute physical possession of the minerals when surface and minerals are separately owned. *See Henley v. United States*, 396 F.2d at 967 (citing *West v. Hapgood*, 141 Tex. 576, 174 S.W.2d 963, 966 (1943)); *Barfield v. Holland*, 844 S.W.2d 759, 767 (Tex.Ct.App. 1993); *Rio Bravo Oil Co. v. McEntire*, 128 Tex. 124, 95 S.W.2d 381, 387 (Comm'n App. 1936) (cannot take mineral estate by adverse possession of surface where estates are severed).

■ Under Texas law, one can only acquire adverse possession of severed mineral interests by actually producing the minerals and extracting them from the ground, *Henley*, 396 F.2d at 967; *Thomas v. Henderson*, 795 S.W.2d 847, 851 (Tex.App.1990) (citing *Carminati v. Fenoglio*, 267 S.W.2d 449 (Tex. Civ.App.1954); *Barfield v. Holland*, 844 S.W.2d at 767; *Kilpatrick v. Gulf Prod. Co.*, 139 S.W.2d 653 (Tex.Civ.App.1940)).

■ The owner of a surface estate can never acquire adverse possession of the mineral estate. *Leggett v. Church of St. Pius*, 619 S.W.2d 191, 193 (Tex.Civ.App.1981). Nor do the mineral owners have the right to exclusive possession of the surface. *See California Housing Securities, Inc. v. United States*, 959 F.2d 955, 958 (Fed.Cir.1992) (no physical occupation found when plaintiff had no right to exclude others).

■ In determining whether flooding of the servient surface estate is a "physical" occupation of the mineral estate's dominant interest in the surface, one must identify the

extent, and even existence, of such property interest. These are determined by state law. *Lucas*, —— U.S. at ——, 112 S.Ct. at 2894; *Preseault v. ICC*, 494 U.S. at 16 n. 9, 20–25, 110 S.Ct. at 924 n. 9, 926–28; *Ruckelshaus v. Monsanto Co.*, 467 U.S. at 1001, 104 S.Ct. at 2871–72.

■ Under Texas law, as plaintiffs point out, the rights of the owner of the surface estate are servient to the dominant rights of the owner of the mineral rights to develop and enjoy the mineral estate. The only proviso has been that the mineral owner's use and possession of the surface for such purposes be reasonably necessary to such development and non-negligent. *E.g. Chambers–Liberty Counties Navig. Dist. v. Banta*, 453 S.W.2d 134, 137 (Tex.1970) (holding that, upon condemnation of the surface estate only, for purpose of possible subsequent use as, *inter alia*, a park, no payment for mineral estate is allowable, since mineral estate remains dominant, and only upon actual subsequent interference with mineral owners' common law right to use the surface estate for mining would a taking occur); *Brown v. Lundell*, 162 Tex. 84, 344 S.W.2d 863, 865 (1961).

Plaintiffs therefore argue that, even though the government had acquired the surface rights in the late 70's (a flowage easement),[12] plaintiffs' dominant right(s) to use the surface estate were later physically invaded, either by the closing of the floodgates and the concomitant threat of imminent flooding,[13] or by the alleged denial of physical access to the surface (by fencing and locked gates).

■ However, the Texas Supreme Court has recently, on remarkably similar facts,

---

12. It apparently was public knowledge at the time of the condemnation of the surface estate (the late 1970's) that the government would flood to the level of up to 220.5 feet m.s.l. See published April, 1977 "Definite Plan Report," Plaintiff's Exhibit 4 at 5–4, 5–5, stating that the "top of. the spillway gates" or "water surface at the top of the conservation capacity" would be at an elevation of 220.5 feet m.s.l. As early as the July, 1971 Nueces River Project Feasibility Report and the December, 1975 Environmental Impact Study, see P's Exhibit 21 at 4, the anticipated maximum water level should have been known.

13. Plaintiffs cite no authority under federal takings law for the proposition that a mere threat of imminent flooding constitutes a taking. See discussion, *supra* at 69–70. The Texas cases also do not support this proposition. *See, e.g., Chambers–Liberty*, 453 S.W.2d at 137; *Getty Oil*, 470 S.W.2d at 623; *Haupt I*, 833 S.W.2d at 699; and *Tarrant County Water Control & Improvement Dist. Number One v. Haupt, Inc*, 854 S.W.2d 909, 913 (Tex.1993) ("*Haupt II* ").

limited the reach of *Chambers* and extended the "accommodation" requirement, which was applied to mineral owners vis a vis private surface owners in *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tex.1971), to governmental surface owners as well. The highest Texas court has held that the government surface owner's actual flooding of the surface to create a reservoir would not constitute an interference with or inverse condemnation of the underlying oil and gas mineral interests unless the mineral owners demonstrated that they were thereby deprived of "all reasonable means of access" to their mineral interests, specifically, that straight surface drilling was "the only manner of use of the surface whereby the minerals can reasonably be produced," *e.g.*, that directional drilling would not be a reasonable "accommodation" of the surface owner's right to flood the surface. *See Haupt II*, 854 S.W.2d at 912–13. The court specifically rejected the Texas Court of Appeals' holding that any diminution in value caused by permanently restricting the most reasonable, lowest-risk and most cost effective means of access—*i.e.*, vertical drilling from dry land—constituted an inverse condemnation.

Even before *Haupt II*, however, Texas courts have suggested that the flooding of the surface is not *per se* a condemnation of the mineral estate, unless by the flooding "the entire fee will be rendered useless." *E.g.*, *Pickens v. Hidalgo County Water Control & Improvement Dist. No. Sixteen*, 284 S.W.2d 784, 785 (Tex.Civ.App.1955); *Trinity River Authority v. Chain*, 437 S.W.2d 887, 892 (Tex.Civ.App.1969) (a flooding is a taking when it "completely destroys" the oil and gas estate, which is a question of fact).

■ The reasonableness of accommodation by directional drilling under *Haupt II* is a question of fact and the burden of proof is on the surface owner. *Id.* at 912, n. 5.[14]

*Regulatory Taking.*

If a regulatory taking in 1982 is alleged, plaintiffs must prove that the government's action denied all "economically viable use" of the entire mineral estate in 1982.[15] *Keystone*, 480 U.S. at 485, 107 S.Ct. at 1241–42; *see also Lucas*, —— U.S. at ——, 112 S.Ct. at 2893. This depends on three factors: The economic impact on the claimant, the extent of interference with his distinct investment backed expectations, and the character of the governmental action. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. These are largely *ad hoc* factual questions. If the deep and shallow interests are not segregable and either retains any substantial value, *e.g.*, because directional drilling was a commercially feasible manner of producing from the deeper formations, no taking occurred.

*Disputed Facts.*

■ The principal disputed factual issue is whether the deep mineral interests were valuable, specifically, whether these were capable of being commercially developed by directional drilling up until the declaration of taking was filed in 1989. If so, and the mineral estate is not divided by depth, there may have been no taking of the estate prior to 1989 by flooding (or threatened flooding) or by the government's alleged physical exclusion of plaintiffs from the area to be flooded.

Plaintiffs contend that directional drilling either was impossible, because they could not have acquired the necessary permission from owners (including the government and certain plaintiffs) of the adjacent surface and mineral estates where the drilling pad would be located, or it was economically impractical (too costly). Plaintiffs claim that the United

---

**14.** On remand, the Texas Court of Civil Appeals concluded that there was adequate evidence to support the trial court's finding of alternative access by directional drilling, but not to support a conclusion that such accommodation was reasonable, when the evidence indicated that directional drilling would result in reduction in the value of the minerals by *100%* or, at best, 75%. *Haupt, Inc. v. Tarrant County Water Control & Improvement Dist. Number One*, 870 S.W.2d 350, 354–55 (Tex.Ct.App.1994) (*"Haupt III"*) (reversing and remanding for a new trial—presumably on damages issue only).

**15.** A regulatory taking may be based on the statute authorizing the dam construction. Plaintiffs do not argue that a partial regulatory taking occurred. *See, generally, Florida Rock*, 18 F.3d at 1568–73, 1574–75 (Nies, J. dissenting).

States' permission to drill was not assured [16] because they would have been dependent upon the competitive leasing procedures of the Interior Department's Bureau of Land Management and the government's policy at that time was not to approve such leases. They also claim that obtaining permission from the large number of owners of mineral and surface tracts on the other adjacent acreage would have been difficult. Defendant disputes all of these assertions. The incremental cost of directional drilling over conventional straight drilling also is hotly disputed.

Even if the deep mineral estate had no value, another material disputed factual issue appears to be raised by the defendant's pleadings—whether, notwithstanding the flooding, the *shallow* estate could have been commercially developed up until the time of the declaration, *e.g.*, by "earth mounds" to protect the wells, as apparently anticipated in the legislation authorizing the taking, or by erecting a platform above the anticipated high water mark for direct drilling.[17] *See* U.S. Statement of Genuine Issues ¶¶ 12, 29 (Feb. 16, 1993); Definitive Plan Report, Exh. A–1, p. 5–6.[18]

▮▮ Plaintiffs bear the burden of establishing that their failure to develop the mineral estate after 1980 or 1981 was due to access or development being restricted *by the government's* acts rather than by other circumstances (*e.g.*, lack of funds) or their own acts or failures to act (*e.g.*, to seek a license or permit, or to construct a drilling platform). *Cf. Kirby Forest*, 467 U.S. at 5, 104 S.Ct. at 2191–92 (no taking when owner voluntarily chose not to develop while waiting for condemnation); *United States v. River-*

*side Bayview Homes, Inc.*, 474 U.S. 121, 126–27, 106 S.Ct. 455, 459 (1985) (holding that a permit requirement is not itself a taking, and noting that "the very existence of a permit system implies that permission may be granted" and that "only when a permit is denied and the effect of the denial is to prevent 'economically viable' use ... can it be said that a taking has occurred").

Thus, if the facts established that plaintiffs were not denied reasonable access to their mineral interests by the proposed or actual flooding of their property because these interests could be economically developed, *e.g.*, by directional drilling or platform drilling, a court might conclude that plaintiffs did not suffer either a physical or regulatory taking of their mineral estate until the government's declaration of taking was filed in the district court on February 24, 1989, and would therefore determine plaintiffs' "just compensation" as of that date. The question, then, is which court—this one, or the federal district court—should, or must, decide these matters. *District Court's Jurisdiction under Declaration of Taking Act.*

The Declaration of Taking Act, 40 U.S.C. § 258a, *et seq.* (1988), directs that, upon the filing of a declaration of taking in a district court, "[just] compensation ... *shall* be ascertained and awarded *in said proceeding* and established by judgment *therein....*" 40 U.S.C. § 258a (in part) (emphasis added).

▮▮ In *Georgia–Pacific*, 568 F.2d at 1321, as here, the plaintiffs filed a claim in the Court of Claims before the government filed a declaration of taking in the district court. The Court of Claims held that it had "no jurisdiction to determine valuation if the taking occurred only when the taking-decla-

---

**16.** Defendant contends that the lack of any request for a permit, or any inquiry as to whether one was available, obviates any need to consider whether it would have been denied.

**17.** Texas cases recognize that platform drilling may permit production from flooded lands. *Cf. Haupt, Inc. v. Tarrant County Water Control & Improvement Dist. Number One*, 833 S.W.2d 697, 698–99 (Tex.Ct.App.1992) ("Haupt I") (platform or directional drilling); *Pan Amer. Prod. Co. v. Texas City*, 295 S.W.2d 697, 700 (Tex.Civ.App. 1956) (discussing drilling of straight bore holes from barges in a bay).

**18.** The Report says that "[i]n view of the generally low production rate of wells in the area, it is estimated that it would be more economical to purchase and plug wells in the deeper areas than to continue with their production. The remaining wells would be provided with earth mounds to permit continued production." It is not clear whether the 'remaining wells' are those that have higher production rates or those that are in the deeper areas, or, if the latter, whether they included wells on land above 220.5 feet, comprising forty-six of the acres at issue here.

ration was filed." *Id.* at 1321.[19] It also noted that the condemnation court is not precluded "from deciding that the actual date of taking preceded the filing of the [district court] suit." *Id.* (citing *United States v. Dow,* 357 U.S. at 20–21, 78 S.Ct. at 1043–44). *See also Preseault,* 494 U.S. at 11, 110 S.Ct. at 921–22 ("If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking.") (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 194–95, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985) (citation omitted)).

 The district court has the authority to decide compensation as of the date of actual taking, even if that taking occurred prior to the filing of the declaration, and to award the value of the taken property to the owners at the time of the taking, not to the record owners at the time the declaration was later filed. *See Dow,* 357 U.S. at 20–21, 78 S.Ct. at 1043–44. *Cf. Kirby Forest Indus.,* 467 U.S. at 12, n. 18, 104 S.Ct. at 2195, n. 18 (noting that Fed.R.Civ.P. 71A(i)(3) "forbids the district court to dismiss an action (without awarding just compensation) if the Government has acquired any 'interest' in the property"). *See also* Fed.R.Civ.P. 71A(i)(3) (stating: "the [condemnation] court . . . shall not dismiss the action as to any part of the property of which the plaintiff has taken possession . . . but shall award just compensation for the possession . . . so taken").

The Declaration of Taking Act expresses an affirmative showing of congressional intent to grant jurisdiction to the district court over taking cases involving property subject to a declaration of taking. *See Preseault,* 494 U.S. at 12, 110 S.Ct. at 922. This court must assume that Congress' failure to provide any exception for cases where a Tucker Act claim was pending in this court was intentional. *See Miles v. Apex Marine*

*Corp.,* 498 U.S. 19, 32, 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990) (Congress is deemed to know the state of the law at the time it passes legislation).[20]

Such a result does not appear to be unreasonable on its face, since exclusive district court jurisdiction would ensure a forum proximate to the location of the property (and local property records) and familiarity with the principles and rules of local property law and would carry out Congress' clear intent that condemnation actions by the government be decided in federal district courts. *See United States v. 88.28 Acres,* 608 F.2d 708, 715 (7th Cir.1979) ("We realize that the federal district court is the preferred forum when the government has initiated condemnation proceedings . . . and that the Court of Claims has been characterized as a 'distant and unfamiliar tribunal and one more expensive and time-consuming than a local federal district judge.'") (citations omitted). Also, a district court's authority to award declaratory, tort, or injunctive relief may make it a more appropriate forum for providing full or alternative relief. *Cf. Southern California Financial Corp. v. United States,* 634 F.2d 521, 525–26, n. 8, 225 Ct.Cl. 104 (1980). Finally, only in a district court may the government request a jury trial on the issue of compensation (although there is no right to such a trial), and utilize the specialized condemnation procedures established for district courts by Fed.R.Civ.P. 71A.

 The Fifth Amendment itself does not guarantee a particular forum for eminent domain adjudication, but only a reasonable, certain and adequate process for obtaining just compensation. *Preseault,* 494 U.S. at 11, 110 S.Ct. at 921–22. If the government provides such a process "and if resort to that process yield[s] just compensation, then the property owner has no claim against the Government for a taking." *Id.* (citations omitted).

19. This court is bound by a decision of the Court of Claims unless it is reversed by the Federal Circuit, en banc. *See South Corp. v. United States,* 690 F.2d 1368, 1370 n. 2 (Fed.Cir.1982) (en banc).

20. No case has held that the district court in a declaration of taking case does not have jurisdiction to decide compensation as of an earlier date than the declaration (as permitted by the Act, the 71A rules, and the *Dow* decision) merely because a suit claiming such compensation was pending in this court at the time of the declaration.

In any event, this court does not have the authority either to disregard, or create exceptions to, the Declaration of Taking Act when, as here, it can be read harmoniously with the Tucker Act. *See Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (where two statutes are "capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective"); *accord Ruckelshaus,* 467 U.S. at 1018, 104 S.Ct. at 2880–81; *Preseault,* 494 U.S. at 12, 110 S.Ct. at 922.

■ Of course, if the government takes more or different property [21] than the declaration of taking identifies, jurisdiction over any taking claim with respect to such property, if valued at more than $10,000, clearly would be vested exclusively in this court under 28 U.S.C. § 1491 (1983). *See Narramore,* 960 F.2d at 1051 (district court did not have jurisdiction in 1990 to reopen its earlier (1959–60) judgment awarding compensation in connection with a declaration of taking of a flowage easement to permit the adjudication of a purported condemnation of another, greater property interest, to wit, a fee simple estate.) Unlike in *Narramore,* the declarations of taking in the district court here cover the entire fee simple estates to the property

claimed to be owned by plaintiffs here, and final judgment has not yet been entered in either case.

■ Even if a stay (or dismissal) is not mandated by the Taking Act, this court, like the court in *Georgia–Pacific,* concludes that justice would be served by suspending further proceedings in this litigation until the district court has had an opportunity to decide when the dates of takings occurred, and the amount of compensation payable on those dates. This court's decision regarding any claim in this case that does not concern the property identified in the district court declarations of taking also shall be suspended until the district courts issue their decisions.[22]

### Conclusion

For the foregoing reasons, the cross-motions for summary judgment are denied, without prejudice, and the case is suspended pending the district courts' final decisions on the date of taking and the value of the property taken as of that date.[23] The parties shall report on the status of both district court proceedings on or before the first day of every third month, commencing on June 1, 1994.[24]

21. The statement in *Narramore v. United States,* 960 F.2d 1048, 1050 (Fed.Cir.1992) that condemnation statutes do not waive the government's immunity from property owners' "counterclaims" clearly does not prohibit a defendant from alleging an earlier date of taking or a greater compensation amount than deposited with the court at the time of the declaration. The immunity is from a claim concerning property interests not identified in the declaration, *e.g.,* as in the authority cited herein, *United States v. 3,317.39 Acres,* 443 F.2d 104, 105–06 (8th Cir. 1971) (involving a claim regarding adjoining· land), *cert. denied,* 404 U.S. 1025, 92 S.Ct. 674, 30 L.Ed.2d 675 (1972).

22. While title as of 1989 already appears to have been decided by the district court (the accuracy of this determination, however, appears to be contested by defendant, see United States' Second Reply to Plaintiffs' Second Response to the United States' Motion for Summary Judgment at 3, n. 3), the district court might be required to decide title anew, as of an earlier actual taking date. In any event, the allocation among property owners of condemnation funds (whether as deposited or as subsequently awarded) as well as their identity as such at the time of taking presumably may be adjusted by the district court at

any time prior to final judgment. *United States v. 243.22 Acres,* 45 F.Supp. 361, 362 (E.D.N.Y. 1942). The district court also appears to have the power to decide whether, as defendant contends, plaintiffs have provided sufficient information in response to discovery requests to establish their ownership interests as of May 18, 1982, if that is determined to be the actual taking date.

23. As previously noted, the foregoing discussion of facts and legal principles is not intended to have *res judicata* or other binding effect on the district court decisions in this case, but only to demonstrate the propriety of staying this action given the theoretical possibility, under certain facts and views of the law, that a district court may conclude that the date of taking occurred prior to the filing of the declaration of taking in that court, and thus have exclusive jurisdiction over this case.

24. The court earlier decided that dismissal of this case was not mandated by 28 U.S.C. § 1500, which deprives this court of jurisdiction over "any claim for or in respect to which the plaintiff ... has pending in any other court any suit or process against the United States ...," as inter-

### Order on Reconsideration

This involved takings case is now before the court on both parties' motions for reconsideration of the March 31, 1994 order denying the parties' cross-motions for summary judgment. *See Stephenson v. United States,* 33 Fed.Cl. 63 (1994). In that order, the court held that summary judgment was inappropriate because material facts remained in dispute. However, it stayed the proceeding pending the outcome of two related condemnation suits in federal district court involving the same property. *See United States v. 844 Acres,* No. 89–22 (S.D.Tex. filed February 24, 1989); *United States v. 427.87 Acres,* No. 89–128 (S.D.Tex. December 8, 1989). The court concluded that the federal district court litigation might resolve many, if not all, of the issues pending in this forum.

Both parties agree that a stay is appropriate. However, defendant now disputes the court's view that the district court has jurisdiction to provide compensation for an earlier inverse condemnation and urges the court not to base the stay on that conclusion.[1]

Plaintiffs fear that the joint operation of 28 U.S.C. § 1500 and the statute of limitations might deny them any forum for their claim, because their assertion of an earlier taking date in the district court might, under certain interpretations § 1500, "instantly" divest them of their claim in this court. Then, if the district court determined it had no jurisdiction, they would be barred by 28 U.S.C. § 2501 from refiling here their 1982 taking claim, as this claim would have accrued more than six years earlier. They seek to have two questions certified for appeal to the Federal Circuit. After careful consideration, and after oral argument, both motions are denied.

### Background[2]

Plaintiffs Stephenson, *et al.* filed an inverse condemnation complaint in this court in 1986, claiming that the federal government took their oil and gas and other mineral rights (individually and collectively "mineral rights") in 1982, without providing just compensation. The case later was consolidated with two suits filed in 1988 by members of the Snoga family, Nos. 298–88L and 299–88L. In 1989, the government formally condemned the property, by filing two declarations of taking in the District Court for the Southern District of Texas, pursuant to 40 U.S.C. §§ 257 and 258a.[3]

The minerals lay underneath land that would be subject to flooding from the Choke

---

preted by *UNR Indus., Inc. v. United States,* 962 F.2d 1013 (Fed.Cir.1992). *See* Order, July 10, 1992. The Supreme Court's recent decision affirming the decision in *UNR, Keene Corp. v. United States,* —— U.S. ——, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993), does not squarely require such dismissal, since it does not decide whether a defendant joined in an *in rem* condemnation proceeding has "a claim against the United States" by virtue of the fifth amendment just compensation clause. (However, it could be argued that no "claim" is pending in the district court if the amount there deposited and paid constitutes just compensation and there is no allegation of an earlier taking.) Nor does *UNR* decide whether a later-filed claim in a district court bars prosecution of a comparable claim in this court. If the district court's decision does not make it moot, this issue, being jurisdictional, may be raised by motion to dismiss or to lift this stay, at any time.

**1.** Defendant (by different counsel) forcefully argued to the contrary, based on *United States v. Dow,* 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958), earlier in this case. Transcript of May 22, 1991 proceeding, filed June 25, 1991, at 11–

**12.** At that proceeding, the government's counsel stated:

> It has already been determined by the Supreme Court that the Federal District Court has jurisdiction to determine all the issues in a condemnation proceeding, including a date of taking which occurs earlier than the formal filing of the declaration of taking and a complaint in a formal imminent [sic] domain proceeding.... [I]f the United States enters into possession, takes control of a property before it files a formal eminent domain case, then the date of taking is determined by the Court and can be under its jurisdictional powers, to be that earlier date when the date, when possession commences.

**2.** The facts are more fully set out in the court's March 31, 1994 opinion and are merely summarized here.

**3.** The government condemned 836 of the 849 acres under dispute here on February 24, 1989. *See United States v. 844 Acres,* No. 89–22. The remaining 13 acres involved in this case were condemned on December 8, 1989. *See United States v. 427.87 Acres,* No. 89–128.

Canyon reservoir and dam, built as part of the Nueces River Project in South Texas authorized by Congress in 1974. In the inverse condemnation proceeding before this court, the parties initially stipulated that the entire mineral estate was taken in 1982, when the government allegedly fenced off the surface area and closed the floodgates to the reservoir and dam. The parties requested a trial limited to the question of damages only.

However, during discovery, plaintiffs produced an appraisal report, hitherto unknown to defendant, concluding that deep mineral (primarily gas) reserves existed, purportedly valued at $4,217,472 in 1982 (twice the value of the shallow reserves, *i.e.,* $2,272,000, or 65% of the total). When plaintiffs indicated their intention to seek additional damages for such deep reserves, the government moved to withdraw its stipulation to a 1982 taking as to the deep mineral estate only. This was allowed.

The government then moved for summary judgment that the deep mineral reserves were not taken until 1989, when the declarations of taking were filed in district court. The government argued that, notwithstanding the government's physical possession, by flooding, of the surface, the deep mineral reserves could have been extracted profitably after 1982, by means of directional drilling.[4] Plaintiffs' cross-motion for summary judgment argued that a single taking occurred, in 1982, of both shallow and deep reserves.

The court denied both motions, concluding that genuine factual disputes as to the feasibility of directional drilling, and two related factual variables (the value of the deep mineral estate depends on the date of the taking, whereas the date of taking may depend upon whether a taking of the deep mineral estate is a substantial diminution of the plaintiffs' property interest) precluded the entry of summary judgment for either party.[5] The court also concluded, in accordance with binding precedent, that, under these circumstances, this court must stay its action pending the district court's determination of the compensation damages due, whether the taking occurred at the time the government filed the declaration of taking or earlier, *e.g.,* by physical possession.

### Defendant's Motion for Reconsideration

As noted, defendant maintains that the federal district court's jurisdiction is statutorily limited to ascertaining the value of the property as of the date of the declaration of taking.[6] Defendant does not oppose the stay, however, because a stay serves the interests of "judicial economy, comity, and internal docket management." As the government now interprets the statutory scheme, in cases where the actual taking precedes the filing of a taking declaration, and the damages for the earlier inverse condemnation were higher than the damages at the time of the declaration, by at least $10,000 dollars,[7] the property owner must await completion of the district court condemnation proceedings and seek in this court any re-

---

4. In 1989, the value of oil and gas had declined precipitously from the high 1982 levels. However, at what point oil and gas prices dropped to a level that made directional drilling prohibitively expensive, and not commercially feasible, is not clear.

5. If the government successfully maintains that the deep and shallow interests are separate and (as it stipulated) that the shallow rights (only) were taken in 1982, the compensation damages, according to plaintiffs' experts, for the 1982 taking, at the point oil and gas prices were the highest, are approximately $2.3 million. The government argues that the deep rights were not taken at that time because they were still valuable if acquired through directional drilling, and were not taken until the cost of production by directional drilling became prohibitively expensive. Defendant currently contends that this

event did not occur prior to the filing of the declaration of taking in 1989.

6. The United States is authorized to condemn land "whenever it is necessary or advantageous for the Government to do so...." 40 U.S.C. § 257 (1988). The petition for condemnation must be filed in federal district court, which has exclusive jurisdiction over that proceeding. *See* 28 U.S.C. § 1358 (1988). When the petition is filed, or at any time before judgment, the federal government may file a declaration of taking, pursuant to the Declaration of Taking Act, 40 U.S.C. §§ 258a *et seq.* (1988). Filing a declaration of taking results in the immediate transfer of title to the government but it requires the government to deposit with the court the estimated value of the property taken. *See* 40 U.S.C. § 258a (1988).

7. *See* 28 U.S.C. § 1346(a)(2) (1988).

78

maining compensation. This argument, in effect, assumes that the permanent taking occurs when the property interest is condemned, and that a temporary taking took place between the actual taking by inverse condemnation and the time the declaration is filed. *See Hendler v. United States,* 952 F.2d 1364, 1375–77 (Fed.Cir.1991) (discussing the term "temporary taking," and noting that "[a]ll takings are 'temporary,' in the sense that the government can always change its mind at a later time");[8] *see also First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 318, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987); *Tabb Lakes Ltd. v. United States,* 10 F.3d 796, 800–801 (Fed.Cir.1993).

■ The court is powerless to define authoritatively the jurisdiction of the federal district court under the Declaration of Taking Act. That is the exclusive prerogative and responsibility of the district court itself. *See Williams v. Secretary of the Navy,* 787 F.2d 552, 557 (Fed.Cir.1986) (explaining that federal courts have the power and duty to determine their own jurisdiction). This was clearly noted in the original order, (*see Stephenson,* 33 Fed.Cl. at 75), and is reiterated here. Whether the statute allows a district court to award compensation for a taking earlier than the date of the taking declaration, or for two takings, *i.e.,* for a prior temporary taking as well as a permanent taking, ultimately is a decision for that court and its reviewing courts.[9]

The government argues that the court's reasons for the stay should not be stated. The purpose of the court's "discussion" of the district court's jurisdiction, however, is needed to explain why the case is being stayed rather than dismissed. If the district court acquired jurisdiction over any prior taking, as well as over the condemnation proceeding, exclusive of this court, the principles of judicial comity and efficiency relied upon by de-

fendant would not justify a stay rather than dismissal, since a stay is an exercise of jurisdiction. *Cf. Dico, Inc. v. United States,* 33 Fed.Cl. 1 (1993), *aff'd,* 48 F.3d 1199 (Fed.Cir. 1995).

■ The court's rationale for the stay thus is strictly necessary to establish the court's jurisdiction, and yet does not bind the district court or otherwise adversely affect the government's position in this litigation. Given the risk that, even if they were found to have claims within this court's jurisdiction, plaintiffs' claims would be barred by the statute of limitations, the court relies on the binding holding of the Court of Claims in *Georgia–Pacific v. United States,* 215 Ct.Cl. 354, 568 F.2d 1316, *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978) which ordered a stay in these circumstances. *See South Corp. v. United States,* 690 F.2d 1368, 1370–71 (Fed.Cir.1982) (Decisions of the Court of Claims carry the same precedential weight in this court as a panel decision of the Federal Circuit, which is binding unless reversed by the Circuit sitting *en banc.*). Therefore, the court declines to delete that rationale from the March 31 Order.

In *Georgia Pacific,* which involved comparable facts, the Court of Claims concluded that this court is required to suspend proceedings, to permit the district court in which the declaration later was filed to decide the actual date of the taking, and determine compensation either as of that date, or as of the actual date of taking. 215 Ct.Cl. at 364, 568 F.2d 1316.

The ruling in *Georgia Pacific* is firmly grounded on the Supreme Court's decision in *United States v. Dow,* 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). As noted in the court's prior order, in *Dow,* a condemnation suit, the Supreme Court held that the taking occurred when the government took possession of the property, and not three years later when the government formally acquired

---

8. Whether this conclusion is intended to apply also to condemnation proceedings under 40 U.S.C. § 258a *et seq.* is not stated. Also, *Hendler* seems to assume that the property is owned by the same parties throughout both takings and that the property interest does not involve an exhaustible commodity.

9. It goes without saying that the declaration of taking gives the district court *in rem* jurisdiction, not over the named defendants individually, but as owners of the property described in the declaration.

title, by filing the declaration of taking: "It is [the earlier] event which gives rise to the claim for compensation and fixes the date as of which the land is to be valued and the Government's obligation to pay interest accrues." *Id.* at 22, 78 S.Ct. at 1044.

Although defendant now insists that *Dow* is limited to its facts, *see supra* note 1, a fair reading plainly reveals that the Court's opinion rests on generally applicable principles of takings law. Indeed, *Dow* has been applied to similar facts by other district courts. *E.g. United States v. 17.0098 Acres of Land,* 269 F.Supp. 960 (E.D.Pa.1967); *United States v. 1060.92 Acres of Land,* 215 F.Supp. 811 (W.D.Ark.1963); *United States v. 27.7 Acres of Land,* 214 F.Supp. 707 (W.D.Ark.1963).

There are no cases to the contrary. Defendant's citation of *United States v. 255.21 Acres,* 722 F.Supp. 235 (D.Md.1989) is not apposite. Although the government was alleged to have taken physical possession of the property prior to filing the condemnation action, the property owner never requested compensation for the government's prior physical possession of the same property as a "temporary" or other taking, but only as a separate tort claim, to be decided after the condemnation action. The district court properly decided that the claim was for a taking, not tort damages, and transferred it to the Claims Court. The issue of whether the district court had the authority to decide the damages due as the result of an early taking, temporary or permanent, was neither raised nor addressed, and therefore the decision is not binding on the jurisdictional issue. *Cf. Huston v. United States,* 956 F.2d 259 (Fed.Cir.1992) (if court did not have the issue of jurisdiction before it, its decision regarding that issue is not precedential).

Although defendant argues that the statutory framework, notwithstanding the resulting inefficiencies, demands dual proceedings, neither the Tucker Act nor the Declaration of Taking Act expressly so provides, even though the possibility of such overlapping circumstances should have been obvious to Congress, which is deemed to have knowledge of the related statutes in effect at the time it passes legislation. In fact, the Declaration of Taking Act expressly requires the district court, in a proceeding thereunder, to award just compensation, including interest, "from the date of the taking," *see* 40 U.S.C. § 258a (1988), not from the date the taking declaration is filed. *See United States v. 125.2 Acres of Land,* 732 F.2d 239, 244 (1st Cir.1984) (describing this legal concept as "well-settled").

*Plaintiff's Motion for Reconsideration*

Like defendant, plaintiffs do not contest the denial of summary judgment, or the stay. Nor do they object to consolidating their takings action in one forum, the district court. However, they fear that requesting the district court to consider an earlier taking date may be deemed a claim by them pending in another federal court that will instantaneously divest this court of their long-pending complaint here under 28 U.S.C. § 1500.

Congress enacted 28 U.S.C. § 1500 shortly after the Civil War to spare the federal government from defending against a suit in the Court of Claims when the same claim was pending in another court. *See Keene v. United States,* —— U.S. ——, —— – ——, 113 S.Ct. 2035, 2039–40, 124 L.Ed.2d 118 (1993) (reviewing the provision's history). The statute now provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500 (Supp. V 1993).

If this court were required to dismiss pursuant to § 1500 (should the government, this court, or the Federal Circuit reconsider and agree that dismissal was required), and the district court thereafter found no jurisdiction (or the Fifth Circuit or the Supreme Court ultimately reversed the district court's finding of jurisdiction over the prior taking), plaintiffs might be barred by the six-year statute of limitations from reinstating their

claim in this court. Under these circumstances, plaintiffs would be deprived of any forum for their claim, even though they timely filed their complaints in this court in 1986 and 1988, well before the declaration of taking.

Plaintiffs therefore have requested the court to revise its order to certify two questions for appeal to the Federal Circuit, pursuant to 28 U.S.C. § 1292(d)(2): (1) whether the district court has jurisdiction to consider an earlier date for the taking than that contained in the declaration of taking, and (2) whether § 1500 divests this court of jurisdiction over an inverse condemnation claim when it is raised (*e.g.*, as a counterclaim) in the district court proceeding.

### Discussion

The Interlocutory Appeals Act, 28 U.S.C. § 1292 (1988), authorizes a federal judge, when issuing an interlocutory order, to include a statement "that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation."[10] The appellate court may in its discretion grant an application to file an appeal if the order contains such a statement and the application is filed within ten days.

The statute by its terms applies only to the appeal of an interlocutory order. *See* 28 U.S.C. § 1292(d)(2). Plaintiffs are not challenging the court's order, however, as they have not requested reconsideration of the denial of summary judgment, or of the imposition of the stay, or of any other factual finding or legal issue in the order. Instead, they are posing general hypothetical questions regarding the legal effect of this order on this court's, and the district court's, future jurisdictional decisions. This is an impermissible use of § 1292.

Nondispositive legal issues may not be certified for appeal under § 1292. *See New York City Health & Hosps. Corp. v. Blum*, 678 F.2d 392, 396 (2d Cir.1982) (explaining that the Interlocutory Appeals Act

"allows interlocutory appeals of orders—not interlocutory appeal of issues"). An interlocutory appeal under § 1292 is proper only if the order involves a controlling question of law, which, if resolved on appeal prior to a final decision, might significantly shorten the litigation.

Plaintiffs may be confusing § 1292 with the certification, by a federal judge to a state court, of an issue of state law. Such procedures may be permitted by state law or rules of court, generally, or a state constitutional provision allowing "advisory opinion" in such circumstances. *See Clay v. Sun Ins. Office Ltd.*, 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960) (permitting certification of a state law question under Florida law). *See generally* 17A Wright, Miller & Cooper, *Federal Practice and Procedure*, § 4248 at 158 (2d ed. 1988).

Even if it were feasible under § 1292, certifying a question regarding the district court's jurisdiction to the Federal Circuit is inappropriate, because the Federal Circuit has no authority to establish the jurisdiction of the district court under the Declaration of Taking Act. That jurisdictional question must be decided, on appeal, by the district court's reviewing court, the Fifth Circuit.

By contrast, the application of § 1500 to a case in this court may be decided by this court and the Federal Circuit. However, this issue will not be ripe until and unless the court issues a decision based on such statute. The Federal Circuit is not empowered to issue advisory opinions or answer other hypothetical questions prior to such event. *Hines v. Secretary of the Dep't of Health & Human Servs.*, 940 F.2d 1518, 1522 (Fed.Cir. 1991); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 919 F.2d 1579, 1581 (Fed.Cir.1990). The "case or controversy" requirement of Article III applies to the Federal Circuit and requires "a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical set of facts." *Aetna Life Ins.*

---

**10.** 28 U.S.C. § 1292(d)(2), which plaintiffs invoke here, extends the authority to certify interlocutory appeals to judges of the Court of Federal Claims.

*Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937).

Section 1500 will deprive plaintiffs of any forum for their pre–1989 takings claim only if: (1) the district court determines it has jurisdiction to award compensation based on the earlier taking date and decides that claim on the merits; (2) the Fifth Circuit reverses; and (3) the court or the Federal Circuit holds that the plaintiffs' earlier taking assertion in the district court constituted a "pending claim" depriving this court of jurisdiction over the earlier taking. Plaintiffs would then be barred from refiling their 1982 taking claim in this court by the six-year statute of limitations.

This concatenation of circumstances seems unlikely under current law. Section 1500 divests the Federal Court of Claims of jurisdiction only if a claim is pending in another forum. *See Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545, 1551 (Fed.Cir.1994). However, asserting an earlier taking date in district court has not been found to constitute a claim (or counterclaim) in district court litigation for § 1500 purposes. There also is no indication in 40 U.S.C. §§ 257, 258a or the cases dealing therewith that the property owner must file a "claim" or "counterclaim" to obtain damages for an earlier taking. *See generally Gloeckner v. United States,* 32 Fed.Cl. 742 (1995) (a property owner's effort to obtain just compensation in a government-initiated condemnation action is not a claim against the government; rather, the property owner is defending himself against an action instituted by the government by offering countervailing evidence).

■ At trial in a declaration of a taking case, the property owner bears the burden of establishing the value of the property. *United States ex rel. Tennessee Valley Auth. v. Powelson,* 319 U.S. 266, 273, 63 S.Ct. 1047, 1051, 87 L.Ed. 1390 (1943); *Yaist v. United States,* 17 Cl.Ct. 246, 257 (1989). Under the procedures utilized in condemnation cases, the property owner is entitled to present evidence regarding the property's value even if he has never voluntarily participated in the

condemnation action, *i.e.,* he has failed to answer the government's petition, has declined to make an appearance, and has waived his defenses or objections to the petition. *See* Fed.R.Civ.Pro. 71A(e) (prescribing the special procedures applicable in condemnation actions).

■ Indeed, the federal courts of appeals uniformly have held that a district court lacks jurisdiction to entertain a true counterclaim in a condemnation proceeding, that is, a separate freestanding claim that otherwise could be asserted independently in another proceeding. *United States v. 38.60 Acres of Land,* 625 F.2d 196 (8th Cir.1980); *United States v. 40.60 Acres of Land,* 483 F.2d 927 (9th Cir.1973); *United States v. 6,321 Acres of Land,* 479 F.2d 404 (1st Cir.1973).

Therefore, it appears that plaintiffs *may not* raise the earlier taking date as a "counterclaim," but only as part of their burden of proving that the value of the property taken exceeds the amount deposited by the government. Because the value of the mineral property identified in this case and the two district court actions depends largely on when it was taken, the question of the time of taking is an element of valuation, not liability.

Also, because the decision to file a condemnation proceeding is wholly beyond plaintiffs' control, the purpose of § 1500—to require plaintiff to make an election of forum for duplicative suits involving the same operative facts, *see Keene,* —— U.S. at —— – ——, 113 S.Ct. at 2039–40—appears not to be implicated when the second suit is brought by another party—the government. *See Meyer v. United States,* 138 Ct.Cl. 86, 150 F.Supp. 314 (1957); *accord Georgia Pacific,* 215 Ct.Cl. at 363 n. 8, 568 F.2d at 1322 n. 8.

### Conclusion

For the foregoing reasons, both motions for reconsideration are denied. The case shall remain suspended pending the district court's decision whether it may decide the value of the property on an earlier taking date and, if so, whether it needs to.[11]

---

11. Such a determination would be necessary only if there *was* a taking in 1982 or later, but

before 1989, notwithstanding considerable re-

In the March 31 order, the parties were instructed to report on the status of the district court proceeding every three months. By order dated May 23, 1994, the court waived the report due by June 1, 1994. Subsequent reports have not been received. Henceforth, the parties shall report on the status of the district court proceeding every third month beginning on or before May 15, 1995.

maining value due to the availability of directional drilling to exploit deep minerals.

