Sarah ILLIG and Gale Illig, for themselves, and as representatives of a class of similarly represented persons, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 98–934L.

United States Court of Federal Claims.

July 27, 2005.

Mark F. Hearne, II and J. Robert Sears, Lathrop & Gage LC, St. Louis, Missouri, for plaintiffs.

Kristine S. Tardiff, Environment and Natural Resources Division, United States Department of Justice, for defendant. With her on the initial brief were Thomas L. Sansonetti, Assistant Attorney General, Evelyn Kitay, Office of General Counsel, Surface Transportation Board, of counsel. With her on the supplemental briefs was Kelly A. Johnson, Acting Assistant Attorney General.

*OPINION*

BRUGGINK, Judge.

This takings class action is before the court on defendant's renewed motion to dismiss plaintiffs' claims for lack of jurisdiction pursuant to RCFC 12(b)(1). Defendant argues that plaintiffs' claims are time-barred by the applicable six-year statute of limitations. *See* 28 U.S.C. § 2501 (2000). This precise issue presented itself earlier in this litigation. At that time, we denied defendant's motion to dismiss finding that the

claims, filed on December 28, 1998, were timely. We held that plaintiffs' claims based on the National Trail Systems Act (Trails Act), 16 U.S.C. § 1247(d) (2000), accrued on December 30, 1992, upon execution of a Trail Use Agreement. *Illig v. United States,* No. 98–934L (Fed.Cl. Nov. 12, 1999). We concluded that any action taken before this date pursuant to the Trails Act had no permanent legal effect on plaintiffs' property rights and therefore rejected defendant's argument that plaintiffs' claim accrued on March 25, 1992, when the Interstate Commerce Commission (ICC) issued a Notice of Interim Trail Use (NITU). *Id.*

The case proceeded for four years through extensive discovery, motion practice and a finding of liability,[1] to a Rule 23(e) settlement hearing, at which this court planned to present to class members the opportunity to object to a proposed settlement. Immediately prior to the hearing, however, the Federal Circuit announced its decision in *Caldwell v. United States,* 391 F.3d 1226 (Fed.Cir.2004), *reh'g en banc denied* (Mar. 23, 2005). The majority there held that "the appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued." *Id.* at 1235. Although much time and effort has been expended in this case, we are compelled by the jurisdictional nature of the issue to put regular proceedings on hold while we address defendant's re-filed motion to dismiss based on this recent change in law. After careful review of the written submissions of the parties and consideration of the oral arguments, we are compelled to grant defendant's renewed motion.

## BACKGROUND

*Factual Background*

Plaintiffs are owners of various parcels of land located along a 6.2–mile segment of the former Carondelet Branch of the Missouri Pacific Railroad (MoPac) in southern St. Louis County, Missouri. For several years, plaintiffs' land was burdened by a right-of-way held by MoPac for railroad purposes.

On February 7, 1992, MoPac filed a Notice of Exempt Abandonment with the ICC seeking authorization to abandon railroad service over the 6.2–mile segment of the Carondelet Branch between milepost 15.8 and milepost 22.0. At the request of Gateway Trailnet, Inc. (Trailnet), a private trail operator, and pursuant to 49 C.F.R. § 1152.29 (1998), the ICC issued a NITU on March 25, 1992, with an effective date of March 27, 1992. The NITU provided that MoPac could negotiate with Trailnet to convert the Carondelet Branch into a trail suitable for recreational purposes. Pursuant to the NITU, if MoPac's negotiations were unsuccessful, and if it failed to enter into an agreement within 180 days, MoPac would be free to abandon its interests in the Carondelet Branch.

MoPac began negotiations with Trailnet, but was unable to reach an agreement before the 180–day period expired on September 23, 1992. On October 6, 1992, the ICC issued a 60–day extension of the negotiating period, which effectively renewed the NITU until November 30, 1992. Still without agreement by the new expiration date, on December 4, 1992, the ICC again renewed the NITU until December 31, 1992.

On December 30, 1992, MoPac and Trailnet finalized a Trail Use Agreement under which Trailnet assumed all economic and legal responsibility for the maintenance of the Carondelet Branch as a recreational trail. MoPac retained the right to petition for the restoration of all or part of the railroad right-of-way for the purpose of future reactivation of rail service. Following the agreement, MoPac executed a quitclaim deed transferring to Trailnet all of MoPac's interests in the land comprising the Carondelet Branch. The deed was recorded with the St. Louis County Recorder of Deeds on January 6, 1993.

In 1997, MoPac[2] requested that the ICC[3] reopen the proceeding and partially vacate

---

1. *Illig v. United States,* No. 98–934L (Fed.Cl. Oct. 22, 2001) (order granting partial summary judgment to named plaintiffs).

2. MoPac merged into Union Pacific Railroad Company on January 1, 1997. We use "MoPac" to refer to both entities.

3. The Surface Transportation Board succeeded the ICC on January 1, 1996. 49 U.S.C. § 702 (2000). For consistency purposes, we use "ICC" to refer to both agencies.

the NITU. MoPac indicated that continued railroad operations were necessary over a portion of the covered railroad line in order to adequately serve a shipper located at the end of the corridor, milepost 22.0. Trailnet agreed to reconvey to MoPac the portion of the corridor needed for railroad operations. On April 18, 1997, the ICC issued a decision to reopen the proceeding and vacate the original NITU solely with respect to the segment between milepost 21.79 and milepost 22.0.

*Procedural History*

Plaintiffs filed their complaint on December 28, 1998, alleging that the conversion of the Carondelet Branch into a recreational trail constituted a taking of their interest in the right-of-way requiring just compensation under the Fifth Amendment. Arguing that the taking occurred upon issuance of the NITU on March 25, 1992, defendant moved to dismiss plaintiffs' claims on the grounds that the complaint was time-barred by the applicable six-year statute of limitations. Plaintiffs argued that their claim was timely because the taking occurred when MoPac entered into the Trail Use Agreement and executed a quitclaim deed to Trailnet on December 30, 1992. In an unpublished opinion issued on November 12, 1999, we held that the claim accrued on December 30, 1992, and denied defendant's motion to dismiss.

We proceeded to find in favor of plaintiffs regarding liability. The parties then initiated settlement discussions. Lead plaintiffs and the United States reached a proposed settlement. Pursuant to RCFC 23(e), we directed notice to the class members giving them an opportunity to object to the terms of the proposed settlement, exceeding $5.1 million. Only four of the eighty-eight eligible class members filed written objections. A fairness hearing was held on December 17, 2004, in St. Louis, Missouri.

## DISCUSSION

■ The complaint was filed on December 28, 1998. The original NITU was issued on March 25, 1992. If the holding in *Caldwell* controls the present facts, the case was filed out of time. If it does not apply, the complaint was timely by two days.

Plaintiffs attempt to distinguish *Caldwell.* They assert that the decision hinged on peculiarities of Georgia law. They contend that the decision suggests that the railroad there had abandoned the easement prior to the issuance of the NITU, thereby entitling the plaintiff to the unencumbered fee before the decided date of taking. Defendant claims the accrual rule announced in *Caldwell* operates as a bright-line rule for all takings claims arising under the Trails Act, irrespective of underlying state law or whether the plaintiff gained unencumbered access before the NITU was issued. We find defendant's interpretation correct. For reasons set out below, *Caldwell* is controlling and requires that we grant defendant's renewed motion to dismiss.

*The Caldwell Decision*

In *Caldwell,* the plaintiffs owned land in Georgia burdened by a railroad easement. After the railroad company filed a request for exemption and the city of Columbus, Georgia filed a railbanking petition, the ICC issued a NITU on August 31, 1994, covering 7.4 miles of corridor. At the request of both parties, the NITU was expanded on June 2, 1995 to cover a total of 10.6 miles. After extension of the NITU negotiating period, the parties reached an agreement. The city informed the ICC of this agreement on July 5, 1996. The railroad company transferred its easement through a quitclaim deed on October 9, 1996. The deed was recorded on October 11, 1996.

The *Caldwell* plaintiffs filed their complaint on October 7, 2002, alleging that the conversion of the railroad right-of-way to trail use constituted a taking. Relying in part on the decision in this case dated November 12, 1999, this court held that the taking accrued on July 5, 1996, when the parties signed the Trail Use agreement. It therefore dismissed the claims as time-barred. *Caldwell v. United States,* 57 Fed. Cl. 193, 203 (2003). Plaintiffs appealed. Addressing for the first time the issue of when a rails-to-trails takings claim accrues, the Federal Circuit framed the issue as one involving the determination of when "state law reversion interests [were] forestalled by operation of section 8(d) of the Trails Act." *Caldwell,*

391 F.3d at 1233. Finding that the issuance of the NITU is the "only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way," *id.* at 1233–34, the court held that the NITU is the "finite start" to either temporary *or* permanent takings claims. *Id.* at 1235. Because both the original NITU issuance and the later NITU expansion occurred more than six years before plaintiffs filed their complaint, the court dismissed the claim as time-barred.

### A. The Parties' Interpretations of Caldwell

Plaintiffs believe the outcome in *Caldwell* turned on Georgia law. Although nothing in the opinion directly indicates a reliance on Georgia law with respect to abandonment, plaintiffs suggest that implicit in the Federal Circuit's holding that "the appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued," is a determination that under Georgia law, the plaintiffs held a possessory interest in unencumbered fee title prior to the issuance of the NITU. Had this not been the case, plaintiffs claim, the NITU would not have triggered the accrual of a claim. Under Missouri law, on the other hand, plaintiffs' land was still burdened by the railroad easement when the NITU was issued. *See Glosemeyer v. United States*, 45 Fed.Cl. 771 (2000) (related case finding that MoPac did not abandon its easement until it conveyed its interest to Trailnet on December 30, 1992). Because plaintiffs lacked any present possessory interest at the time of the NITU, plaintiffs claim that *Caldwell* is thus distin-

guishable and we need not apply its holding to this case.

At oral argument, plaintiffs also suggested another interpretation of *Caldwell*, which similarly assumes an implicit reliance on Georgia law. Plaintiffs point to language in *Caldwell* explaining that a rails-to-trails takings claim accrues only when a specific set of circumstances arise: "We hold that the Fifth Amendment taking, if any, under the Trails Act is accomplished when an NITU is issued *and* state law reversionary[4] interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled." 391 F.3d at 1236 (emphasis added). Placing emphasis on the conjunction, plaintiffs point out that a takings claim requires 1) a NITU to be issued, *and* 2) forestallment of state law property rights. Plaintiffs conclude that this means the taking cannot occur until the right to full possession would accrue under state law. Plaintiffs point for support to *Hash v. United States*, 403 F.3d 1308 (Fed.Cir.2005), where the Federal Circuit recently stated: "In *Preseault v. ICC*, the Court held that if abandonment of railway use and application of the Trails Act effects a taking *when the easement would otherwise revert to the owner of the servient estate*, the landowner may sue for compensation under the Tucker Act." *Hash*, 403 F.3d at 1312 (emphasis added) (citations omitted).[5]

Plaintiffs allege that in *Caldwell*, the landowner's right to full use of the fee arose before the ICC issued the NITU. When the NITU was issued, the right to use of the surface was blocked, thus satisfying both requirements of the *Caldwell* formulation. Plaintiffs allege that here, by contrast, their own right to use of the surface (governed by Missouri law) did not come into effect before issuance of the NITU on March 25, 1992.

---

4. *See infra* note 5.

5. Presumably, the court uses the concept of "reverter" of the easement as shorthand for extinction of the encumbrance and the removal of the encumbrance to full use of the surface by the fee owner. When the right of way is abandoned, no estate in land reverts. The Federal Circuit explained the use of this terminology in *Preseault v. United States*, 100 F.3d 1525 (Fed.Cir.1996). The court stated: "Instead of calling the property owner's retained interest a fee simple burdened by the easement, this alternative labels the prop-

erty owner's retained interests following the creation of an easement as a 'reversion' in fee.... Under either characterization the result upon termination of the easement is the same." *Id.* at 1533–34. In any event, the court in *Hash* did not, however, specifically address the issue of claim accrual. Nor did the Court in *Preseault v. ICC*, 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990), which established liability on behalf of the Government for takings in Rails-to-Trails cases without reaching the issue of claim accrual.

Rather, they insist that their state interests could not take effect, and could therefore not be forestalled, until the Trail Use agreement was signed and title conveyed on December 30, 1992. In *Caldwell*, plaintiffs argue, the requisite formulation materialized when the NITU was issued; in this case, the formulation did not arise until December 30, 1992. Therefore, plaintiffs insist it was not until this date that their takings claim accrued.

Defendant responds that any potential distinction between Georgia and Missouri law regarding abandonment of railroad easements is irrelevant, given the breadth of the *Caldwell* decision. Defendant insists that the Federal Circuit's decision was not dependent on state law or on an assumption that the railroad company's abandonment caused plaintiff's right to use of the surface to vest prior to the issuance of the NITU. Rather, it argues that the decision leaves no room for this construction; that it is predicated on the operation and application of the Trails Act in general, regardless of specific state property law. The focus, it argues, is on the point at which the state law abandonment *process* is blocked or forestalled by federal action, even though the landowners are only later precluded from enjoying unencumbered fee title and full possession and use of their land.[6] As a result, defendant claims, the issuance of the NITU operates as the blanket accrual date for all takings claims under the Trails Act, regardless of whether abandonment is complete prior to NITU issuance.

We find defendant's interpretation consistent with the apparent intent of the Federal Circuit in *Caldwell*. Without discussing Georgia law, or inquiring as to the timing of abandonment, the court unequivocally stated: "We therefore hold that the appropriate event for any takings claim under the Trails Act occurs when the NITU is issued." *Caldwell*, 391 F.3d at 1235.

Defendant's construction of *Caldwell* was adopted recently in *Renewal Body Works, Inc. v. United States*, 64 Fed.Cl. 609 (2005). There, the plaintiff filed a Trails Act takings claim on December 11, 2003, more than six years after the NITU was issued. *Id.* at 612. In an attempt to distinguish *Caldwell*, the landowner claimed that, in his case, the railroad company abandoned and state law reversionary interests took effect prior to the issuance of the NITU. *Id.* at 614. As a result, he argued that the alleged taking was the burden of a new easement on his property and not the blocking of state law reversionary interests. *Id.* The court stated:

> The Court need not determine whether the easement was abandoned prior to the issuance of the NITU .... *Caldwell* applies whether or not the easement was abandoned ... because in either case the only Government action that could give rise to plaintiff's taking claim was the issuance of the NITU.... This is true whether the alleged taking resulted from the blocking of state law reversionary interests or the imposition of a new burden on plaintiff's property. In either situation, the landowner's claim accrues on the date of NITU issuance.

*Id.* at 615. The court dismissed his claim as time-barred because the plaintiff filed his complaint more than six years after the NITU was issued, irrespective of when abandonment occurred.[7] *Id.* at 616.

Defendant offers other grounds for adopting its interpretation of *Caldwell*. It argues that plaintiffs' interpretation requires a false premise—that it is possible for a landowner to gain unencumbered fee prior to the issuance of a NITU. By definition, the Trails Act operates to preclude the execution of state law abandonment. *See Preseault v. ICC*, 494 U.S. 1, 8, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990)

---

6. Defendant claims that the interest taken when the ICC issues a NITU is the landowner's right to recover full unencumbered fee title. Defendant recognizes that sometimes the railroad company and intended trail user fail to reach an agreement, in which case the NITU converts into an effective notice of abandonment. When this happens, the landowner's takings claim that accrued on the date of the NITU ceases to be a permanent takings claim because the landowner re-

gained full unencumbered fee title. The Federal Circuit noted, but failed to address, whether the landowner's taking claim that accrued on the NITU date becomes a temporary taking claim when no agreement is reached. *Caldwell*, 391 F.3d at 1234 n. 7.

7. Plaintiffs in *Renewal Body Works* filed a Notice of Appeal on April 11, 2005.

(indicating that, by deeming interim trail use as discontinuance rather than abandonment, Congress intended to "ensure that potential interim trail use [is] considered *prior to abandonment*") (quoting H.R.Rep. No. 98–28, at 8–9 (1983), U.S.Code Cong. & Admin.News 1983, pp. 112, 119–20) (emphasis added); *Caldwell,* 391 F.3d at 1233–34 (explaining that the NITU "operates to prevent abandonment . . . and to preclude the vesting of state law reversionary interests in the right-of-way").[8] Consequently, abandonment is never fully consummated and landowners can never gain unencumbered fee title prior to the issuance of a NITU. Defendant claims that if *Caldwell* stands for the presumption that a landowner must gain unencumbered access to his land prior to the accrual of a takings claim, landowners will never have standing to challenge the government's action in a Rails–to–Trails case. Although supportive of the result in *Caldwell,* we need not rely on this argument to determine the accurate interpretation of *Caldwell.*

We agree with defendant and *Renewal Body Works. Caldwell* imposes a new, blanket rule that the accrual of *any* takings claim under the Trails Act is the issuance date of the NITU. It is therefore unnecessary to determine the validity of plaintiffs' distinction between Georgia law and Missouri law.

## B. *The Effect of the Caldwell Decision on this Court*

Plaintiffs' other arguments amount to the assertion that *Caldwell* is wrongly decided; that it is inconsistent with Supreme Court and Federal Circuit precedent.[9] We could agree with plaintiffs—we stated our views when defendant filed its first motion—but that would be irrelevant. The decisions of the Federal Circuit are binding on this court, even when they require retroactive applica-

tion. *See, e.g., Sodexho Marriott Mgmt., Inc. v. United States,* 61 Fed.Cl. 229, 237 (2004). The Federal Circuit explained:

> the Court of Federal Claims may not deviate from the precedent of the United States Court of Appeals for the Federal Circuit any more than the Federal Circuit can deviate from the precedent of the United States Supreme Court. Trial courts are not free to make the law anew simply because they disagree with the precedential and authoritative analysis of a reviewing appellate court.

*Crowley v. United States,* 398 F.3d 1329, 1335 (Fed.Cir.2005), *reh'g en banc denied,* (Apr. 27, 2005). *Caldwell* is the last word on the precise issue in front of us. We have no choice but to follow the majority opinion. If our interpretation of *Caldwell* is wrong, we would welcome reversal.

## C. *Last Government Act Analysis*

In anticipation of our interpretation of *Caldwell,* plaintiffs suggest an alternative approach to preserving timeliness. It draws on the fact that the NITU in this case was amended after initial issuance. The amendment was within six years of filing the complaint. Similarly, the NITU in *Caldwell* was amended, but there the amendment was greater than six years prior to filing. Plaintiffs argue that the Federal Circuit treated both the date on which the original NITU was issued and the date of amendment as possible dates for accrual. The court considered the two dates as "potential dates of NITU issuance." *Id.* at 1235. Because both dates were outside of the limitations period, however, the plaintiff's claims were time-barred and the court did not need to address the issue directly. On that basis, plaintiffs argue that this court should find that their

---

8. Furthermore, the ICC retains plenary authority over the regulation of railroad abandonments. *See Preseault v. ICC,* 494 U.S. 1, 8, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). State law cannot operate until after the ICC relinquishes its jurisdiction by issuing a certificate of abandonment or exemption. *Id.* at 21–22, 110 S.Ct. 914 (O'Connor, J., concurring). Presumably, the ICC retains its jurisdiction after issuing the order allowing exemption and before issuing the NITU. Whether its jurisdiction is exclusive during this time peri-

od such that state law cannot effect an abandonment, however, need not be decided here.

9. It is worth noting that the arguments put forward here by plaintiffs mirror the arguments they put forward in their Brief of Amici Curiae in Support of Appellants' Petition for Rehearing *En Banc* filed in *Caldwell.* Despite those arguments, the Federal Circuit denied rehearing. *Caldwell v. United States,* No. 03–5152 (Fed.Cir. Mar. 25, 2005).

claim accrued, not on the date of the original NITU issuance, but on the date when the last government action relating to the NITU occurred. Plaintiffs allege that by reopening the entire proceeding and vacating the original NITU with respect to 0.21 miles of railroad line, the government extended its action into April 1997. As a result, they argue, the six-year statute of limitations ran in April 2003, making timely their claim filed on December 28, 1998.

We believe this is an over-reading of *Caldwell*. Aside from identifying the two dates in *Caldwell* as "potential dates of NITU issuance," the court gives no guidance to whether those dates are two equally viable dates of claim accrual. What we believe to be of controlling significance is the court's explicit ruling that only one NITU is issued during the railbanking process. *Caldwell*, 391 F.3d at 1230. The reduction in scope of the NITU by 0.21 miles in this case, even if of legal importance, could only affect the limitations period for that section. More importantly, the interference with the process of recovering full use of the surface for the entire parcel unquestionably began on March 25, 1992. We view that as the new test under *Caldwell*, even for claims of permanent taking.[10] Plaintiffs therefore fail in their attempt to argue that their claim accrued in April 1997.

The ICC issued the NITU on March 25, 1992. Plaintiffs filed their complaint on December 28, 1998. Applying *Caldwell* as interpreted above, because plaintiffs' complaint was filed more than six years after the NITU was initiated, plaintiffs' claim was filed too late.

*Has the Statute of Limitations Defense Been Waived?*

Plaintiffs argue that the statute of limitations is not a jurisdictional issue, but is instead an affirmative defense subject to waiver. Plaintiffs allege that defendant embraced the court's prior adverse ruling on the statute of limitations and failed to reserve the right to challenge it, thereby waiving its right to re-assert the defense. We disagree.

We address first the question of whether the limitations defense is jurisdictional. The applicable statute of limitations states that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2000). The Federal Circuit has consistently held that this is a jurisdictional limitation. *E.g., Frazer v. United States*, 288 F.3d 1347, 1351 (Fed.Cir.2002); *Caguas Cent. Fed. Sav. Bank v. United States*, 215 F.3d 1304, 1310 (Fed.Cir.2000); *see also Reed Island–MLC, Inc. v. United States*, 67 Fed.Cl. 27, 33 (2005) (citing *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed. Cir.1988)). Because this six-year statute of limitations is a requirement attached by Congress as a condition of the government's waiver of sovereign immunity, it cannot be waived by the parties or set aside by the court. *See, e.g., Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1376–77 (Fed.Cir. 1998) (finding that the six-year statute of limitations set forth in the statute "may not be waived by either the Court of Federal Claims or the parties"); *Hart v. United States*, 910 F.2d 815, 818–19 (Fed.Cir.1990). As explained by this court in *Southern California Federal Savings & Loan Ass'n v. United States*, 52 Fed.Cl. 444 (2002), "Notwithstanding its listing in Rule 8(c) as an affirmative defense, in our Court, where the United States is the only Defendant, the statute of limitations may be raised by the Defendant or *sua sponte* by the Court, and at any time." *Id.* at 452.

Although plaintiffs cite more recent Federal Circuit decisions, those decisions do not support their assertion that the applicable statute of limitations is non-jurisdictional and subject to waiver. Plaintiffs rely on *Venture Coal Sales Co. v. United States*, 370 F.3d 1102 (Fed.Cir.2004) and *Ariadne Financial Services Pty. Ltd. v. United States*, 133 F.3d 874 (Fed.Cir.1998)—two cases where the court distinguished between dismissal for lack of subject matter jurisdiction and dis-

---

**10.** We note also one factual distinction. The entire segment here was affected by the original

NITU. In *Caldwell*, portions of the corridor were unaffected by the original NITU.

missal on the grounds that the claim is barred by the statute of limitations. Although the court conceded that timeliness is not an issue of *subject matter* jurisdiction, it held that 28 U.S.C. § 2501 is a jurisdictional limitation. *Venture Coal*, 370 F.3d at 1105 n. 2.

Plaintiffs' reliance on certain Supreme Court decisions is equally misplaced. Plaintiffs rely on *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990) (permitting equitable tolling in suits against the United States the same way it operates in suits against private parties) and *Franconia Associates v. United States*, 536 U.S. 129, 145, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) (refusing to recognize a special claim accrual rule for breach of contract cases against the United States because limitation principles apply to the United States in the same manner they apply to private parties). Neither case rejects the jurisdictional nature of section 2501. The fact that the limitations period is subject to tolling does not mean it is not jurisdictional. Furthermore, they are both consistent with the rule that the United States, as a defendant litigating a case in this court, cannot waive its statute of limitations defense.

Plaintiffs, however, claim that in *Scarborough v. Principi*, 541 U.S. 401, 124 S.Ct. 1856, 158 L.Ed.2d 674 (2004), the Supreme Court rejected the jurisdictional classification of claim-processing rules, including section 2501. Dealing with a statute providing a deadline for filing attorney fee applications, the Court stated,

'Clarity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.'

*Scarborough*, 541 U.S. at 413–14, 124 S.Ct. 1856 (quoting *Kontrick v. Ryan*, 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004)). The *Scarborough* decision does not conflict with the notion that when the United States is the defendant, a statute of limitations that operates as a condition on the waiver of sovereign immunity must be strictly construed and applied like a jurisdictional limitation not subject to waiver by the parties or the court. Because 28 U.S.C. § 2501 acts as a constraint on our ability to exercise subject matter jurisdiction, and because that limitation is not subject to waiver, we need not pursue plaintiffs' arguments that defendant waived its statute of limitations defense.[11]

Plaintiffs also allege that even if the statute of limitations is a jurisdictional issue that cannot be waived, defendant is precluded from asserting the defense because it stipulated that the date of taking was December 30, 1992, the date the Trail Use agreement was signed. Plaintiffs argue that defendant is bound by its stipulations and cannot now adopt a position that is contradictory to its prior stipulations. For a number of reasons, we disagree.[12]

It is true that the government is bound by its stipulations to the same extent that a private litigant is bound. *See H. Hackfeld & Co., v. United States*, 197 U.S. 442, 446–47, 25 S.Ct. 456, 49 L.Ed. 826 (1905) (acknowledging that no public policy rule prevents the United States attorney from stipulating to ultimate facts); *Judson v. United States*, 120 F. 637, 643 (2d Cir.1903) (recognizing the authority of a private attorney to bind his client by stipulations and finding that "precisely the same rule must be applied to the United States appearing by its District Attorney"); *United States v. Fallbrook Pub. Util. Dist.*, 165 F.Supp. 806, 821

---

**11.** We note, however, that defendant stipulated to liability only after we ruled that plaintiffs' claim accrued on December 30, 1992. *See* Joint Stipulations Related to Liability. Until that decision came into question under *Caldwell*, defendant was entitled to rely on our ruling. For this reason, defendant did not waive its right to reassert the statute of limitations defense.

**12.** It appears that plaintiffs attempt to invoke the doctrine of equitable estoppel. In order to do so, plaintiffs must show "affirmative governmental misconduct." *See Frazer v. United States*, 288 F.3d 1347, 1354 (Fed.Cir.2002). We decline to view as misconduct defendant's reliance on our earlier decision establishing December 30, 1992 as the date of taking. Accordingly, we decline to apply the doctrine of equitable estoppel.

(S.D.Cal.1958) (recognizing the power to enter stipulations on behalf of the United States as a necessary exception to the general rule that United States Attorneys have limited authority to bind the government). Nevertheless, stipulations that are contrary to the law may be ignored. *Kaminer Constr. Corp. v. United States*, 203 Ct.Cl. 182, 488 F.2d 980, 988 (1973) (holding that "[i]n instances where a stipulation is . . . contrary to law, . . . this court may disregard the stipulation"). More particularly, a party may be relieved of a stipulation when there has been an intervening change in law. *See Am. Honda Motor Co. v. Richard Lundgren, Inc.*, 314 F.3d 17, 21 (1st Cir.2002) (finding that "a party may be relieved of a stipulation for good cause" and that "an intervening change in law might count as good cause"). In *Stephenson v. United States*, 33 Fed.Cl. 63 (1995), for example, the parties stipulated to the date of taking. *Id.* at 65. Relying in part on the Supreme Court's decision in *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984),[13] the court declared that it was "not bound to accept the parties' stipulation as to the date of taking . . . ." 33 Fed.Cl. at 65 n. 2. Accordingly, the court allowed the government to withdraw its stipulation. *Id.* at 65.

■ Our construction of the stipulations is that the government stipulated to no more than that, in light of our prior rulings, it was liable to plaintiffs.[14] Even if we assume, as plaintiffs allege, that defendant specifically stipulated to the date of taking being December 30, 1992, any such stipulation is contrary to *Caldwell*. For that reason, the stipulation may be disregarded. As an intervening change in law, the *Caldwell* decision provides

a sufficient basis for this court to set aside the parties' stipulations. Moreover, following the rationale accepted by this court in *Stephenson*, we are not bound to accept a stipulation as to the date of taking. It is *Caldwell* that is binding, not the stipulations. Despite the litigation history of this case and the near-settlement position in which the parties found themselves three days prior to *Caldwell*, we cannot preclude defendant from re-asserting its statute of limitations defense.

## CONCLUSION

In light of *Caldwell*, the accrual date of plaintiffs' takings claim is March 25, 1992, when the ICC issued the NITU. Because plaintiffs filed their complaint on December 28, 1998, more than six years after the claim accrued, their claim is barred by the statute of limitations. Therefore, defendant's motion to dismiss is granted. The clerk is directed to dismiss the complaint for lack of jurisdiction. Each side to bear its own costs.[15]

---

**13.** In *Kirby Forest Industries, Inc. v. United States*, the parties stipulated that the date of taking was March 6, 1979, the first day of trial. 467 U.S. at 7, 104 S.Ct. 2187. After determining that the stipulation pertained to the date as of which the land was to be valued, not the date on which the Government took the land, the Fifth Circuit found that the stipulation was not controlling and that the date of taking was actually March 26, 1982, the day on which compensation was paid. *Id.* at 8–9, 104 S.Ct. 2187. Finding no reason to disagree, the Supreme Court affirmed the idea that the parties' stipulation did not control the Court's determination of the date of taking. *Id.*

**14.** Defendant did state, "The takings claims alleged in plaintiffs' class action complaint accrued on December 30, 1992." This was in the context of responding to Plaintiffs' Motion for Amendment of the Entry of Appearance for Claimant Molly Bramoweth. We attach little significance to this. By that point, we had ruled that plaintiffs' claim accrued on December 30, 1992. Defendant was entitled to rely on this ruling.

**15.** Defendant's Motion to Strike Plaintiffs' Sur-Reply as exceeding the page limit set by RCFC 5.2(b)(2) is denied as moot.