# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3488

_____

Sarah Illig; Gale Illig, for Themselves   *
and as Representatives of a Class of   *
Similarly Situated Persons,   *
  *
     Appellants,   *
  *   Appeal from the United States
   v.   *   District Court for the
  *   Eastern District of Missouri.
Union Electric Company,   *
  *
     Appellee.   *

_____

Submitted: June 15, 2011
Filed: August 31, 2011

_____

Before MURPHY and SMITH, Circuit Judges, and READE,[1] District Judge.

_____

SMITH, Circuit Judge.

   Sarah and Gale Illig (collectively, "Illig"), on behalf of themselves and others similarly situated, brought suit against Union Electric Company ("Union") in Missouri state court, alleging claims of inverse condemnation and trespass under Missouri law.

-----

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation.

After Union removed the case to federal district court,[2] the court granted Union's motion to dismiss, concluding that the applicable statutes of limitations had expired on both of Illig's claims. Illig challenges this ruling on appeal. For the following reasons, we affirm.

## I. *Background*
### A. *Missouri Pacific's Right-of-Way on Illig's Property*

The present dispute stems from the conversion of a railroad line on Illig's property to a public trail, pursuant to the National Trails System Act of 1968 ("Trails Act"),[3] 16 U.S.C. § 1241, *et seq.* This conversion took place between 1991 and 1994.

---

[2]The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

[3]For background purposes, we briefly review the procedures for such a conversion under the Trails Act before discussing the conversion of the property in the present dispute.

The Surface Transportation Board (STB) regulates "the construction, operation, and abandonment of most railroad lines in the United States." *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004). If a railroad wishes to abandon a right-of-way within the STB's jurisdiction, it must either apply for abandonment or seek an exemption. *Id.* "If the STB approves a standard abandonment application or grants an exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect." *Id.* at 1228–29 (citing *Preseault v. Interstate Commerce Comm'n* (*Preseault I*), 494 U.S. 1, 6–8 (1989)).

Alternatively, pursuant to the Trails Act, through a process known as "railbanking," a railroad may "negotiate with a state, municipality, or private group (the 'trail operator') to assume financial and managerial responsibility for operating the railroad right-of-way as a recreational trail." *Id.* at 1229. The Federal Circuit has described the railbanking process, and its legal effects on property owners, as follows:

[T]he typical railbanking process begins when a rail carrier files an abandonment application or, as in this case, a request for an exemption. 49 U.S.C. §§ 10903, 10502; *see also* [*Nat'l Ass'n of Reversionary Prop. Owners* (*NARPO*) *v. STB*, 158 F.3d 135, 138 (D.C. Cir. 1998)].

If the STB approves the request for an exemption, it will publish a notice of exemption in the Federal Register. 49 C.F.R. § 1121.4(b) (2004). A potential trail operator may then file a railbanking petition pursuant to 49 C.F.R. § 1152.29(a). . . . If the railbanking petition meets the[] criteria [specified in the regulations], and the railroad agrees to negotiate with the petitioner and so communicates to the STB within ten days of the filing of the trail use petition, the STB will issue a Notice of Interim Trail Use or Abandonment ("NITU"). 49 C.F.R. §§ 1152.29(b)(2) and (d). This NITU permits the railroad to discontinue service, cancel tariffs, and salvage track and other equipment, "consistent with interim trail use and rail banking" without consummating an abandonment and the NITU extends indefinitely to permit interim trail use once an "agreement" is reached between the railroad and the trail operator. 49 C.F.R. § 1152.29(d)(1).

* * *

Only one NITU is issued once the parties indicate their intent to negotiate for conversion of the corridor to trail use. If negotiations go as planned and an agreement is reached, the NITU extends indefinitely for the duration of recreational trail use subject to the trail operator's fulfillment of its agreed-upon obligations. The STB retains jurisdiction for possible future railroad use, and state law reversionary interests that would normally vest upon abandonment are blocked. *Preseault I*, 494 U.S. at 8, 110 S. Ct. 914. An "escape-clause" is also provided by the NITU such that if no agreement is reached within 180 days, the NITU "automatically converts into an effective . . . notice of abandonment," *id.* at 7 n.5, 110 S. Ct. 914, which permits the rail carrier to "abandon the line entirely and liquidate its interest." *Id.* at 7, 110 S. Ct. 914; *see also* 49 C.F.R. § 1152.29(d)(1).

Illig has owned certain lots of land in St. Louis County, in fee simple absolute, since 1984. The land had been encumbered prior to Illig's ownership. Missouri Pacific Railroad Company ("Missouri Pacific") operated a 6.2-mile long railroad line—known as the Carondelet Branch—through Illig's land, pursuant to an easement obtained as early as 1872. It is undisputed that Missouri Pacific's easement was "for railroad purposes." In 1972, Missouri Pacific executed a Wire License Agreement with Union, allowing Union to install electrical transmission poles, lines, and other appurtenances along the railroad line.

In February 1992, Missouri Pacific sought to abandon and discontinue its railroad operations over the Carondelet Branch, including the 6.2-mile stretch of railroad line on Illig's land. Pursuant to the Trails Act, Missouri Pacific filed a notice of exemption with the STB,[4] seeking permission to do so. In its notice, Missouri Pacific "certifie[d] that no local traffic has moved over the line for at least two years" and that "[o]verhead traffic previously moved over the line has been rerouted successfully." Missouri Pacific also certified that it had published a notice of its abandonment and its notice of exemption on January 29, 1992, "in [the] *Watchman-Advocate* in Clayton, Missouri, [a] newspaper in general circulation in St. Louis, County, Missouri[,] where the rail line is located."

Around this same time, Gateway Trailnet ("Trailnet"), a private non-profit organization devoted to creating and operating public trails, asked the STB to issue a NITU, which would allow Trailnet to acquire Missouri Pacific's easement and convert the railroad corridor to a public trail. On March 2, 1992, Missouri Pacific informed the STB of its willingness to negotiate with Trailnet for interim trail use.

---

*Id.* at 1229–30.

[4]As of January 1, 1996, the STB succeeded and began performing "all functions" formerly performed by the Interstate Commerce Commission (ICC). 49 U.S.C. § 702. We use "STB" to refer to both the STB and the ICC.

-4-

On March 25, 1992, the STB issued a NITU, permitting Missouri Pacific and Trailnet to enter into negotiations. The NITU further stated:

> The parties may negotiate an agreement during the 180-day period prescribed below. If no agreement is reached within 180 days, [Missouri Pacific] may fully abandon the line.

> * * *

> . . . [Missouri Pacific] may discontinue service, cancel tariffs for the line on not less than 10 days' notice to the Commission, and salvage track and related materials consistent with interim trail use/rail banking after the effective date of this decision and notice. . . .

> * * *

> . . . If an agreement for interim trail use/rail banking is reached by the 180th day after service of this decision and notice, interim trail use may be implemented. If no agreement is reached by the 180th day, [Missouri Pacific] may fully abandon the line subject to the condition set forth above.

On December 30, 1992, in a Donation, Purchase, and Sale Agreement ("Trail Use Agreement"), Missouri Pacific agreed to sell its right-of-way over Illig's property to Trailnet. That same day, Missouri Pacific signed a quitclaim deed, conveying its interests to Trailnet. Also on that day, Missouri Pacific assigned to Trailnet several agreements that it had previously entered into with licensees, including Union. Missouri Pacific recorded the deed with the St. Louis County Recorder of Deeds office on January 6, 1993.

On December 28, 1998, Illig sued the United States in the United States Court of Federal Claims, alleging that the conversion of Missouri Pacific's railroad line to a recreational trail amounted to a taking under the Fifth Amendment. Ultimately, in

-5-

2005, the court dismissed Illig's claim as untimely under the applicable six-year federal statute of limitations. *See Illig v. United States*, 67 Fed. Cl. 47, 50 (2005).

B. *Instant Litigation*

On December 23, 2002, while Illig's claim was pending in the Court of Federal Claims, Illig initiated the instant action against Union in Missouri state court. Union removed the case to the federal district court, which stayed the case pending the final outcome of *Illig v. United States*. After that case was resolved, Illig filed an amended complaint in the district court, asserting causes of action for inverse condemnation and trespass under Missouri law. Illig alleged that Union's use of and presence on Illig's property exceeded the scope of the easements "created by the Trails Act." Further, Illig alleged that Trailnet did not own an interest in Illig's land that would allow it to sell Union a right to use Illig's land for electrical transmission lines. Illig also alleged that Union never obtained an easement or license from Illig or any previous landowner. As a result, Illig alleged that "Plaintiffs' property has been damaged since January 6, 1993, by the unauthorized and unlawful presence of high-voltage electrical transmission lines and other structures placed on and across the Plaintiffs' land by [Union]."

Union subsequently moved to dismiss the complaint on several grounds, arguing, *inter alia*, that federal law preempted Illig's inverse condemnation and trespass claims and that the applicable statutes of limitations barred the claims. The district court granted Union's motion to dismiss, concluding that although federal law did not preempt the claims, they *were* time-barred. The court determined that Illig's claims accrued on March 25, 1992, when the STB issued the NITU. The court dismissed the claims as time-barred because Illig failed to commence the action within the ten- and five-year limitations periods, respectively, for her inverse condemnation and trespass claims.

## II. *Discussion*

Illig argues that the district court erroneously concluded that the statute of limitations had expired on her claims for inverse condemnation and trespass. Specifically, she contends that the court applied the proper statutes of limitations but incorrectly determined when her claims accrued. First, Illig maintains that she could not have brought her claims while Union was using the land under the license that Missouri Pacific had granted it. Thus, she could not have ascertained her damages for this claim before January 6, 1993, when Missouri Pacific "first publically alienated its interest" in the land via the quitclaim deed. Prior to that date, Illig "had no knowledge or notice [that] the NITU had issued and affected [her] land," and even if she did, "the NITU's effect upon [Union's] license [from Missouri Pacific] was still unknown and unknowable." Second, Illig contends that the district court did not consider her continuing-trespass allegation that would have allowed her to recover damages for Union's ongoing trespasses in the five years preceding her filing of the instant suit. Finally, Illig asserts that the district court confused the property interest taken from Illig under the Trails Act—the right-of-way easement for the rail/trail corridor—with Union's use of the land under the license. She argues that Union's license was a distinct property interest that was "taken" at a different time than the easement. Accordingly, the fact that a federal taking occurred upon issuance of the NITU has no effect on when Missouri Pacific's license to Union terminated. Again, she maintains that the license did not terminate until the quitclaim deed was recorded on January 6, 1993.

"We review *de novo* the district court's dismissal of an action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)" and "accept the factual allegations of the complaint as true." *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009). In addressing a motion to dismiss, "[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (citing *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir.

1999) (noting that the same standard applies to a Rule 12(b)(6) motion to dismiss)). A court may dismiss a claim under Rule 12(b)(6) as barred by the statute of limitations if the complaint itself establishes that the claim is time-barred. *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008).

## A. *Accrual*

The parties agree that Missouri's statutes of limitations govern Illig's Missouri claims for inverse condemnation and trespass. The parties also agree that a ten-year statute of limitations applies to Illig's inverse condemnation claim, *Shade v. Mo. Highway & Transp. Comm'n*, 69 S.W.3d 503, 512–13 (Mo. Ct. App. 2001), and a five-year statute of limitations applies to her trespass claim, Mo. Rev. Stat. § 516.120(3). Both causes of action accrue when the damage is "capable of ascertainment." *Shade*, 69 S.W.3d at 514 ("A cause of action for inverse condemnation accrues once the fact of damage is capable of ascertainment."); *Cook v. DeSoto Fuels, Inc.*, 169 S.W.3d 94, 103 (Mo. Ct. App. 2005) (noting that an action for trespass accrues "when the damage resulting therefrom is sustained and is capable of ascertainment" (quotation and citation omitted)). Under Missouri law, "'capable of ascertainment' . . . mean[s] capable of being ascertained by a reasonable person using reasonable diligence." *Cook*, 169 S.W.3d at 103 (quotation and citation omitted). The test is objective and "is met when the plaintiffs' right to sue arises and they could have first maintained the action successfully." *Id.*

Illig's claims allege that Union is present on Illig's land and using it without Illig's consent. Under Missouri law, a landowner may bring a claim of inverse condemnation against an entity with condemning authority[5] when the condemnor invades or appropriates a valuable property right, causing injury to the landowner. *Clay Cnty. Realty Co. v. City of Gladstone*, 254 S.W.3d 859, 864 (Mo. 2008).

---

[5]The district court noted, and the parties do not dispute, that Union "has the power of eminent domain under Missouri law" pursuant to Missouri Revised Statutes § 523.010.

Similarly, under Missouri law, "[o]ne can commit the tort of trespass either by unauthorized entry on land or by exceeding the scope of any license to enter upon the land." *Ogg v. Mediacom, L.L.C.*, 142 S.W.3d 801, 809 (Mo. Ct. App. 2004) (quotation and citation omitted).

Illig acknowledges, however, that Missouri Pacific, as the holder of a right-of-way easement over her property, granted Union a valid license to enter the land and erect electrical lines in 1972. Under Missouri law, because Missouri Pacific held its easement "for railroad purposes," Union's license remained valid as long as it, too, was used "for railroad purposes." *See St. Louis, I.M. & S. Ry. Co. v. Cape Girardeau Bell Tel. Co.*, 114 S.W. 586, 589 (Mo. Ct. App. 1908) (observing that a railroad company holding an easement may contract with another to construct and maintain telephone line "for railroad purposes"; but noting that "the consensus of opinion is to the effect that the railroad company is not permitted to use, sell, or incumber the easement for other than railroad purposes"); *see also Eureka Real Estate & Inv. Co. v. S. Real Estate & Fin. Co.*, 200 S.W.2d 328, 332 (Mo. 1947) ("It is true that the owner of an easement may, in some circumstances, license or authorize third persons to use its right[-]of[-]way for purposes not inconsistent with the principal use granted . . . ."). In other words, Union's license was entirely derivative of Missouri Pacific's right-of-way. Illig agrees, arguing that when Missouri Pacific "abandoned" its railroad right-of-way, Missouri Pacific's "interest was terminated and the license [Missouri Pacific] had granted [Union] was also terminated." Illig, however, disputes the date when Missouri Pacific actually terminated its interest in the right-of-way.

The Federal Circuit's decision in *Caldwell* provides some help in determining when Missouri Pacific's interest in the right-of-way terminated, despite addressing a different type of claim than Illig's present claims. In *Caldwell*, the Federal Circuit was asked to consider when a claim for a taking, under the Trails Act, accrued. 391 F.3d at 1228. The court concluded that such a taking occurs on the date that the STB issues the NITU. *Id.* at 1233. When a NITU is issued, the court explained, "state law

reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." *Id.* Although the NITU does not signal a final agreement between a railroad and a trail operator, the court held that the NITU nevertheless triggers a taking, even if the resulting taking is ultimately temporary. *Id.* at 1234. Once the NITU has been issued, the railroad's right-of-way will either be assumed by the trail operator (indefinitely blocking the landowners' state-law reversionary interests) or, if no agreement is reached, abandoned (allowing the landowners' state-law interest to revert). *See id.* In either case, once the STB issues the NITU, the railroad has relinquished its interest in and discontinued its involvement with the property. *See id.* at 1230 (noting that the "NITU permits the railroad to discontinue service, cancel tariffs, and salvage track and other equipment").

Illig, however, argues that Union's license remained valid—and thus, her cause of action could not accrue—until Missouri Pacific formally transferred its right-of-way easement to Trailnet with a quitclaim deed. We disagree. Illig's claims depend on whether Union had a valid license to be on her land—not upon who owned the easement or underlying land. As noted, under Missouri law, Union's license remained valid as long as it was used "for railroad purposes." *St. Louis, I.M. & S. Ry. Co.*, 114 S.W. at 589; *see also Eureka Real Estate & Inv. Co.*, 200 S.W.2d at 332. The Federal Circuit's decision in *Caldwell* instructs that, once the STB issued the NITU, on March 25, 1992, Missouri Pacific no longer retained an interest in the easement; as of that date, the federal government had "taken" the interest, and the right-of-way subsequently would either be transferred to Trailnet or would revert to Illig. *See* 391 F.3d at 1234. Further, the NITU permitted Missouri Pacific "to discontinue service, cancel tariffs, and salvage track and other equipment." *Id.* at 1230. In other words, as of March 25, 1992, even though Missouri Pacific had not yet deeded the right-of-way to Trailnet, Union's licenses—as a matter of law—could no longer be used "for railroad purposes" and, thus, would no longer be valid under Missouri law. *St. Louis, I.M. & S. Ry. Co.*, 114 S.W. at 589; *see also Eureka Real Estate & Inv. Co.*, 200

S.W.2d at 332. Accordingly, Illig could have asserted her Missouri claims for inverse condemnation and trespass as of this date.

Knowing when Illig could have asserted her claim, however, does not end the inquiry. Illig *could* have brought her suit as of March 25, 1992, but that does not necessarily mean that her damage was objectively capable of ascertainment on that date. To that end, Illig argues that neither Missouri Pacific, the STB, nor Trailnet provided any notice of the NITU to her. The *Caldwell* court, however, noted that "[i]f the STB approves a request for an exemption, it will publish a notice of exemption in the Federal Register." *Id.* at 1230 (citing 49 C.F.R. § 1121.4(b) (2004)). Further, the documents incorporated into Illig's own complaint reveal that Missouri Pacific *did*, in fact, publish a notice of abandonment of the Carondelet Branch on January 29, 1992—before the STB issued the NITU—in the "*Watchman-Advocate*, in Clayton, Missouri, [a] newspaper in general circulation in St. Louis County, Missouri[,] where the rail line is located." *Cf. Legal Commc'ns Corp. v. St. Louis Cnty. Printing & Publ'g Co.*, 24 S.W.3d 744, 748 (Mo. Ct. App. 2000) (noting that, under certain conditions, publication in a newspaper may provide constructive notice of a foreclosure sale to those with an interest in the property). Taken together, we conclude that these actions were sufficient to give notice to "a reasonable person using reasonable diligence," *Cook*, 169 S.W.3d at 103, to ascertain that Union no longer had a valid license because it could no longer use the license "for railroad purposes," *St. Louis, I.M. & S. Ry. Co.*, 114 S.W. at 589; *see also Eureka Real Estate & Inv. Co.*, 200 S.W.2d at 332. Thus, Illig's claims for inverse condemnation and trespass accrued no later than March 25, 1992, the date the STB issued the NITU. Because Illig did not file her suit until December 23, 2002, both claims are time-barred, absent a tolling provision or some exception to the statute of limitations.

## B. *Continuing Trespass*

Illig argues that, even if her claims accrued on March 25, 1992, the continuing nature of Union's trespass would allow her to recover damages for the five years

preceding the commencement of this action. Missouri law recognizes "continuing trespass" theory. *See, e.g.*, *Cook*, 169 S.W.3d at 104–06. The Missouri Court of Appeals has explained the distinction between a single trespass and a continuing trespass as follows:

> [W]hen there is only *one wrong* that results in continuing damage, the cause of action accrues once that wrong has been committed and the resulting damage becomes capable of ascertainment. But when there are *continuing or repeated wrongs* that are capable of being terminated, successive causes of action accrue every day the wrong continues or each time it gets repeated, the end result being that the plaintiff is only barred from recovering those damages that were ascertainable prior to the statutory period immediately preceding the lawsuit.

*Id.* at 105 (internal citation omitted).

In *Cook*, the plaintiffs claimed a continuing trespass caused by a leak at a neighboring gas station. *Id.* Because the plaintiffs' complaint referred to "the releases" of contaminants onto their property, the court concluded that the plaintiffs had alleged "a continuous or repeated migration of contaminants onto their property." *Id.* at 105–06. Thus, the court concluded that the plaintiffs had "adequately presented a continuing trespass claim." *Id.* at 106.

Unlike the plaintiff in *Cook*, however, Illig has not alleged *repeated* intrusions onto her property that would support a claim for a continuous trespass. Her trespass claim only alleges that Union's "presence" on her land has caused and will cause damage. Although she alleges that Union's presence "will continue to cause damage in the future," she has not alleged "a continuous or repeated" trespass. In her brief, she claims that "the repeated flow of electricity over [her] property . . . constitutes a continuing trespass." No such allegation appears in her amended complaint. As a

result, she did not allege a continuous trespass, and her trespass claim is barred by the applicable five-year statute of limitations.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____